# EXHIBIT 1

**JAMS ARBITRATION**

**REFERENCE No. 5400000585**

**HEKA FUNDS SICAV PLC**

    **Claimants**

**And**

**CIRCLE INTERNET FINANCIAL, LLC ,**

    **Respondents.**

**Attorneys for Claimant Heka Funds SICAV PLC**

    **McDermott, Will & Emery**

        **Eli Berman**

        **One Vanderbilt Avenue**

        **New York, NY 10017-3852**

        **Email: eberman@mwe.com**

**Attorneys for Respondent Circle Internet Financial LLC**

    **Jones Day**

        **Mark Rasmussen**

        **Yvonne W. Chan**

        **100 High Street**

        **21st Floor**

        **Boston, MA 02110-1781**

        **Email: mrassmussen@jonesday.com**

            **ychan@jonesday.com**

1

**RULING ON RULE 18 MOTIONS**

In this arbitration, each side has made motions pursuant to JAMS Rule 18. Under the Rule, "the Arbitrator may permit any Party to file a Motion for Summary Disposition of a particular claim or issue. . . The Request [for Summary Disposition] may be granted only if the Arbitrator determines that the requesting Party has shown that the proposed motion is likely to succeed and dispose of or narrow the issues in the case."  In this matter, Claimant asks that the Arbitrator grant its motion for summary judgment on the breach of contract and implied covenant of good faith and fair dealing alleged in its Demand.  The Respondent moves for summary judgment on particular claims in Claimant's Demand, specifically the claims for breach of contract, implied covenant of good faith and fair dealing, declaratory relief, and the Delaware unfair trade practices claim.  After review and for the reasons stated here, the Arbitrator denies the Rule 18 motions by each side based on breach of contract and the implied covenant of good faith and fair dealing. The Arbitrator grants Respondents' motion based on the claims by Claimant for declaratory relief and unfair trade practices.[1]

---

[1] The jurisdiction of this Arbitrator is based on the Master Services Agreement (MSA) between these two parties. It was agreed to on or about March 23, 2022. The MSA incorporates the User Agreement containing the arbitration provision.

**Standard of Review for Summary Judgment.**

Under Federal Rule 56 of Civil Procedure (Rule 56) which is relevant in this case, it states "a party may move for summary judgment, identifying each claim or defense---or part of each claim or defense---on which summary judgment is sought. The court shall grant summary judgment *if the movant shows that there is no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of law." (FRCP 56(a) (emphasis added). The 2010 Amendment Notes to the Rule advise that "the statement denying summary judgment need not address every available reason."

In this case, the parties have filed a remarkable collection of documents, supporting their claims.  Interestingly, the sheer volume of their separate filings makes the legal obligation of the Arbitrator in this case somewhat easier in evaluating the motions in the context of Rule 56 and summary judgment motions generally.  The Supreme Court, in a series of cases,  has determined the appropriate application standards for Rule 56 in the pretrial setting.  One of the lead cases is *Anderson v. Liberty Lobby Inc.* 477 U.S. 242 (1956) (*Liberty Lobby).*  This case involved a motion for summary judgment where the claim alleged libel and the First Amendment.  The Court held summary judgment will not lie regarding an issue of material fact if the dispute over that fact is "genuine,"---the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party.  At the summary judgment stage of the case, the function of the judge or arbitrator is not to weigh the evidence and determine the truth of the matter but to decide whether a

genuine issue of fact exists for the trial of the case.  At the pretrial stage of this case, the inquiry is whether the evidence presents a sufficient disagreement to require a submission to the fact finder or whether it is so one-sided that one party must prevail as a matter of law.  *Liberty Lobby, supra* at 2509-2512.  As the Court observed, in the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter but to decide whether there is a genuine issue for the trial.  There is no issue for a trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* at 2511.

If the nonmoving party in the case presents specific facts suggesting there is a genuine issue of fact, then, under Rule 56(c), the judge will not grant summary judgment since there is no entitlement by the moving party to judgment as a matter of law.  In this assessment there is no requirement the judge makes findings of fact at this pre-hearing stage.  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial---whether, in other words, there are any genuine factual issues that properly can be resolved only by the finder of fact because they may be reasonably resolved in favor of either party."  *Id.* at 2512.  In essence, the motion is akin to a directed verdict at trial, the distinction being one of timing.

The exception to the legal standard articulated in *Liberty Lobby* was found in *Scott v. Harris,* 550 U.S. 372 (2007), a civil rights case involving excessive force by the arresting officer.  A videotape captured the alleged excessive force incident

4

allowing the hearing judge to assess the claim.  The Court noted the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be *no genuine* issue of *material fact." Scott v. Harris*  at 380.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, the court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. Fiction will not replace material facts supporting a particular side.

The focus at this stage asks for an assessment of the nonmoving party's arguments, as well as what is presented by the proponent, and this review is based on the record as a whole, not selected materials.  While the standard of proof cannot be "metaphysical doubt," summary judgment will be denied if the Arbitrator finds the record as a whole could not lead a rational trier of fact to find for the moving party.  *Mitsushita Elec. Industrial Co. v. Zenith Radio Corp.* 475 U.S. 574, 586-87. The Arbitrator should deny a Rule 18 motion seeking summary judgment if a reasonable jury could conclude the nonmoving party's version of the facts as true. Simply put, this is the situation presented to this Arbitrator at this time.

Our judicial process limits approval of such motions.  This is to ensure the fact issues will be decided with the benefit of the truth-seeking facets of a trial or adversarial hearing. "Trial on oral testimony, with the opportunity to examine and cross-examine witness in open court, has often been acclaimed as one of the persistent, distinctive and most valuable features of the common law system."

*United States v. United Scenic Artists Local 829 of the Brotherhood of Painters,* 27

F.R.D. 499, 501 (S.D.N.Y. 1961) (Kaufman J.). Additionally, with this voluminous

record presented at the summary judgment stage, the subsequent arbitration

hearing will serve to bring into sharper focus particular issues of importance which

"have been obscured by the voluminous affidavits with their statements,

counterstatements and alternative positions, and the conflicting conclusions . .. .

drawn from the multiple facts." *United States v. Bethlehem Steel Corp.,* 157 F.Supp.

at 879 (S.D.N.Y. 1958) (Weinfeld J.).

The relevant Delaware law evidenced the application of *Liberty Lobby* in the

analysis of summary judgment motion and its support.  In the context of summary

judgment, the courts have emphasized the need to consider the substantive

evidence standard applicable to the underlying claims.  Specifically, Delaware

courts have adopted the principle that the trial court must consider whether the

evidence presented could meet the burden of proof required at trial.

In *Cerberus Intern. Ltd. v. Apollo Management, L.P.* the Delaware Supreme

Court reviewed the trial court's ruling on summary judgment. The trial court had

sustained the defendant purchasing company in a dispute with plaintiff

shareholders over the language of a merger agreement involving the prior entity

and the purchasers.  The language of the merger contract was directly in dispute.

The Supreme Court overturned the trial court's decision. *Cerebus Intern. Ltd. v.*

*Apollo Management L.P* 794 A.2d 1141 (2002) (*Cerebus*).

In *Cerebus*, the purchaser argued the correctness of the trial court, contending that even if Cerebus (plaintiff party) put forth *some* evidence in support of its claim regarding the meaning of the merger agreement, summary judgment was proper if no reasonable finder of fact could conclude "that the evidence proffered on the summary judgment record was clear and convincing." *Id* at 1149. In rejecting this position, the Court followed explicitly the *Liberty Lobby* decision stating this was the commonsense approach and "the trial court must determine whether the plaintiffs on the summary judgment record proffered evidence from which *any rational trier of fact could infer that plaintiffs [the party opposing the summary judgment motion] have proven the elements of prima facie case by [*preponderance of the evidence]." [2] (emphasis added). Furthermore, the Court stated "it is not permissible for the trial judge to weigh the evidence or resolve conflicts arising from pretrial documents, affidavits, depositions, or other evidence. That is the job of the trier of fact after hearing *all* of the evidence, including live witness testimony that, as here, may be in conflict over the correct interpretation of the agreement and the intent of the parties in assenting to it. This is an axiom of the judicial process." *Id* at 1150.

*Cerebus* brings home this point by admonishing "if the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate. If a rational trier of fact could find any material fact that would

---

[2] In *Cerebus,* the issue was whether there was a reformation of the merger contract. That analysis involves a review by clear and convincing evidence. In our case we are dealing with preponderance of the evidence, hence the change in the quote from the decision.

favor the non-moving party in a determinative way, summary judgment is inappropriate." *Id* at 1150. The test is one of a *rational fact finder* not a reasonable one. *Id.*

In *Telxon Corp. v. Meyerson,* 802 A.2d 257 (2002) the Supreme Court of Delaware reiterated that a trial judge (or arbitrator) should not weigh the evidence or resolve conflicts when evaluating summary judgment motions. The Court cited *Anderson v. Liberty Lobby, Inc.,* emphasizing that the test is whether the evidence viewed in the light most favorable to the nonmoving party presents any dispute of material fact. *Telxon Corp.* supra. at 262. *Telxon Corp.* also directs that summary judgment may be inappropriate when there is a need to determine credibility in resolving factual disputes material to the case, and that trial courts should "act 'with caution' in granting summary judgment. *Id.*

Further reflecting this deferential standard in favor of the *nonmoving* party was the position of the Supreme Court in *WaveDivision Holdings LLC v. Highland Capital Management, L.P.* 49 A.3d 1168, 1173 (2012). There the Court reminded the trial courts that the tribunal does not weigh the evidence or resolve conflicts presented by discovery when evaluating the summary judgment record. The court must examine the factual record and make reasonable inferences in favor of the nonmoving party to determine if there is any dispute of material fact. *Id.* at 1175.

These decisions of the highest courts of the United States and Delaware guide this Arbitrator in the review of the plethora of documents submitted in this

8

case. As indicated, the volume of submitted material directs the Arbitrator towards the results in the motions.

This opinion has engaged in extended discussion of the standard of review for these dispositive motions because only with the legal understanding of this preliminary approach to the issues can the ruling here be understood.

**Summary Judgment Claims by both Claimant and Respondent on Breach of Contract and Claimants' Implied Covenant of Good Faith and Fair Dealing.**

The elements of a breach of contract under the law of Delaware require the moving party to establish (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resulting damages to the moving party or plaintiff.

The elements dealing with the implied covenant of good faith and fair dealing are more substantial and nuanced. The legal underpinnings of this cause of action are:

(1) the existence of a contract. The implied covenant is only applicable where there is an existing contract.

(2) Filling Gaps in the contract. The implied covenant is used to fill gaps in the express provisions of a contract, ensuring that the parties' reasonable expectations are fulfilled. *Lonergan v. EPE Holdings, LLC,* 5 A3d. 1008 (2010)

9

(3) Good Faith and Fair Dealing.  The covenant requires parties to act in a manner that is faithful to the agreed common purpose and consistent with the justified expectations of the other party.  *Allen v. El Paso Pipeline GP Co., LLC* 113 A.3d 167 (2014).

(4) Prohibition of Arbitrary or Unreasonable Conduct.  A party must refrain from arbitrary or unreasonable conduct that prevents the other party from receiving the fruits of the bargain.  *Winshall v. Viacom Intern. Inc.* 55 A.3d 629 (2011).

(5) The Covenant is not a Free-Floating Duty.  The covenant does not impose a free-floating duty of good faith detached from the contract's terms.  It is not an equitable remedy for rebalancing economic interests after unforeseen events. *Nemec v. Shrader* 991 A2d 1120 (2010); *Baldwin v. New Wood Resources LLC* 283 A3d 1099 (2022).

(6) Counterfactual Inquiry. Courts will consider what the parties would have agreed upon had they considered the issue during their original negotiations. *ArchKey Intermediate Holdings Inc. v. Mona* 302 A.3d 975 (2023).

Having discussed the legal elements this Arbitrator must implement at summary judgment; the next step is to apply these principles to the remaining claims in the Demand and the contentions of Respondent.  The Arbitrator will focus on the breach of contract/covenant of good faith and fair dealing contentions first. We will then assess the declaratory relief issue in the case.  Finally, the review here will address the deceptive trade practices claim.

Regarding the claim of breach of contract and the implied covenant of good faith and fair dealing (ICGFFD) the Arbitrator recognizes each side has submitted a more than substantial amount of documents including depositions, text messages, and like materials in teeing up these issues.  However, the amount of discovery provided brings home to this Arbitrator the conclusion these particular legal claims present the need for a hearing with the confrontation of witnesses to resolve the legal issues.  Reconciling credibility through effective witness examination is especially important in this case.

The central focus here will be the contention of market manipulation. While there are contractual agreements central to this arbitration, the handling of the relationship between Heka and Circle Internet during the term of the contract, factually, is very important. There is the need to factually assess the administration of the agreement  undertaken by Respondents in first reducing and then terminating the engagement of Heka while the contracts were in force.  Did Respondent engage in the correct action or overreaction is the gist of the contentions developed in the papers submitted to date?  However, this Arbitrator is not able to properly assess these actions in this case dealing with these contracts without the further presentation of relevant evidence at a full hearing.

If the contention that Claimant engaged in improper market manipulations instead of simple arbitrage is found, the Respondent may very well sustain its position in the arbitration under the relevant agreements.  However, the Arbitrator

11

cannot resolve the issue of market manipulation simply by reading pages of documents in this Rule 18 motion.

In this case, the parties will need to establish the legal distinction between market manipulation and arbitrage. Each side has repeated the words of Judge Posner in *Sullivan & Long Inc. v. Scattered Corp.,* 47 F.3d 857 (7th.Cir. 1995) *(Scattered Corp.)*:

> The name for what Scattered did is not market manipulation but arbitrage. Arbitrageurs are traders who identify and eliminate disparities between price and value, or as in this case, between price and tomorrow's price where the difference cannot be attributed to any prospective change in value. . . By doing this, arbitrageurs promote the convergence of market and economic values that we suggested was the central objective of securities regulation. Consider a case in which the identical stock is selling for different prices on two exchanges at the same time. Since the value is the same, the prices should be the same. By buying stock on the exchange where the price is lower and reselling it on the other exchange, the arbitrageur brings about a convergence of price with value. . . . Scattered played the arbitrageur's role in trying to equate the prices of these two nearly identical goods. Arbitrage is not market manipulation. The opposite of a practice that creates artificial prices, it eliminates artificial price differences." *Scattered Corp.* at 862

The rationale of Judge Posner's comments is just as viable in the setting of our case and cryptocurrencies like USDC and USDT, as it was with stocks traded in the markets. In another case on market manipulation, the Third Circuit noted: "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities [and cryptocurrencies] are determined by the interplay of supply and demand, not rigged by manipulator. In that vein, courts must distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and

12

deceive purchasers and sellers." *GFL Advantage Fund LTD v. Colkitt,* 272 F.3d 189, 205 (3d.Cir. 2001).

To the Arbitrator, any analysis of the line between market manipulation and appropriate arbitrage behavior in light of our record, requires the evaluation of the intentions and perceptions of critical witnesses, some already deposed, and the "live" assessment of their credibility.  For example, the Arbitrator has considered the statements of certain witnesses presented in this record. In reviewing the testimony of only Respondent's employees, there is sufficient evidence to deny the Rule 18 motion based on the factual record they provide.  During a single period of May 4-11, 2023 (seven days), particular Circle employees stated the following:

1. Kash Razzaghi. "My point is that this is a manufactured arb not a market driven one.  It's manufactured by Tether by eliminating their usual fees." (stated on May 5, 2023, Respondent (R) Ex. 38).

2. Kash Razzaghi. "My perspective is that Tether is encouraging the arb by waiving their fees for you. [comments to Heka personnel]. (May 7, 2023, R Ex. 17).

3. Cole Carpenter. "At that point, if the arb doesn't close with Fabio's volume then I think we can legitimately shut off his access because we can clearly say there's something unnatural occurring here and he's the sole beneficiary in a rigged market." (May 9, 2023, R Ex. 42.)

4. Kash Razzaghi. "Frontini's job (Heka) is to find inefficiencies in the market and that is what he optimizes for." (May 8, 2023, Claimant (C) Ex. 42.)

5. David Norton to Frontini. "I understand the trade you are doing and the fact is that momentum/demand is in favor of USDT given a variety of micro factors. I know your principal strategy is arbitrage, hence you are exploiting the trade. If you aren't doing it, someone else will." (May 9, 2023, Ex. 69).

6. David Norton to Respondent's employees. "I know it's not popular but Fabio's trades make rational sense to me. . . If for whatever reason we cut him off or restrict him, one of two things will happen. Either someone else will step in burning either directly through us or via Coinbase. . . or the arb will widen, as it did this weekend." (May 8, 2023, C Ex. 42.).

These remarks at the very least indicate a range of opinions among Respondent's employees and suggest the theory of improper market manipulation against Claimant is not a consistent view even among the key personnel of Respondent. Credibility necessarily comes into play and an evaluation of relevant witnesses is apparent.

Add to these remarks above, the contention of unethical behavior suggested in Respondent's pleadings attributed to Claimant's arbitrage tactics is in conflict with the pending record. After all, arbitrage as noted by Judge Posner does not necessarily amount to improper market manipulation. We have the remarks of

14

Helen McCarthy of Respondent regarding Claimants. "Heka knows compliance, as Frontini does things by the book." (C Ex. 13, March 8, 2023), and David Norton, stating that Heka was "clean", and that Norton did not know on what basis Circle Internet should be restricting them [Heka]." (C Ex. 73, April 13, 2023).  The record leaves unanswered at this juncture whether any rational fact finder would be precluded from siding with Claimant at the summary judgment stage of this case. *Cerebus Intern. Ltd v. Apollo Management LP,* 794 A.2d at 1149-50.

It is true that this is a breach of contract case. Here, both sides agree that the MSA applies to their relationship. We also have the argument of Respondents the UA and USDC Terms also apply with full force while Claimant contends those two contracts are trumped in part by the language of the MSA.  Naturally, based on the record here, there is a factual dispute regarding the impact of the MSA on contractual rights under the UA and USDC in this litigation.  Each side has presented arguments in the papers representing their understanding under the several agreements and the full application of these agreements is factually disputed.

To Respondents, the MSA adopts the UA in relevant part. This includes Sections 15 and 16 of the UA along with Section 17 of the USDC.  (See R Exhibits 8 and 10).  Section 15 of the UA identifies "Transaction Limits" and expressly states "Circle reserves the right to change the deposit, withdrawal, storage, transfer, and velocity limits on your Circle Account as we deem necessary.  We may establish individual or aggregate transaction limits on size or number of deposits,

15

withdrawals. . . you may initiate using your Circle Account. ." Section 16 of the UA states in relevant part: "We reserve the right to change, suspend, or discontinue any aspect of the Services or the Platform at any time. . . without notice and without liability. We may, in our sole discretion, delay any transaction if we believe that such transaction is suspicious, may involve fraud or misconduct, violates applicable laws. . .or violates any term of this Agreement." These terms indicate substantial deference to the exercise of the UA and related agreements in a consumer relationship with Respondents.

On the other hand, Claimants rely exclusively, it seems, on MSA. To Claimants, the MSA is an agreement for Respondent to provide Services to Claimant including the minting and redeeming of USDC. (C Exhibit 1 MSA at §§ 2, 3(a)). Respondent may only "refuse, limit, suspend or terminate" Heka services under particular circumstances, and that Heka may not engage in conduct that violates an "Acceptable Use," (MSA § 2(a)). Finally, to Claimants, while the MSA does incorporate the UA  and other agreements, the MSA controls when there is inconsistency with these other agreements such as the UA and USDC, and Claimants believe it is controlling here. (MSA § 2(b)).

Each side points to contract language that it relies on for their position. Interpretation based on witness testimony seems relevant to resolve the contention. The intent of the parties when they agreed to the terms not only of the UA but also the MSA at the time of formation will be fully considered by the fact finder, therefore. Under Delaware law, when determining the scope of a contractual

16

obligation, the courts aim to effectuate the intent of the parties by interpreting the contract or contracts according to the plain, ordinary meaning, and giving effect to *all* the provisions. *Trifecta Multimedia Holdings Inc. v. WCG Clinical Services LLC* 318 A.3d 450 (2024). If a breach occurs, the non-breaching party may seek remedies, including damages or specific performance, depending on the terms of the contract and the nature of the breach. *Wagner v. BRP Group Inc.,* 316 A.3d 826 (2024).

Under Delaware law, the fact finder examines the written contract in issue to determine the intent of the parties and scope of the contractual obligations. The objective theory of contracts---how an objective third party would understand the meaning of the agreement---is the evaluative standard. *Salamone v. Gorman,* 106 A.3d 354, 368 (2014), *JER Hudson GP XXI LLC v. DLE Investors LP,* 275 A.3d 755 (2022). However, if there is ambiguity or if each side submits arguably reasonable contentions regarding the meaning of the language in a contract, Delaware courts do consider extrinsic evidence to determine the party's intent. *United Rentals, Inc. v. RAM Holdings, Inc.* 937 A.2d 810, 835-836 (2007). However, the introduction of extrinsic evidence still must be considered primarily from the standpoint of the *objective* theory of contracts. *Id.*

Relying on these guidelines of contract interpretation, the Arbitrator at this stage understands the importance of the MSA in this case and also fully appreciates the argument regarding the application of the UA argued by Respondents. However, there is a factual issue, based Claimant's contention regarding the

17

language in the MSA stating "if any provision contained in this Agreement [the MSA] is in conflict with or inconsistent with, any provision in any of the foregoing agreements or policies, the related provision contained in this Agreement shall govern and control."  (MSA § 2(b)).

The Claimants also advance the argument that *if the contract* is ambiguous or susceptible to alternative interpretations, the courts apply the doctrine of *contra proferentem* and interpret the contract against the drafting party.  This principle ensures that any ambiguity in the written contract may be construed in favor of the non-drafting party, thereby placing the burden of clarity on the party that drafted the contract.  *Kuhn Const. Co. v. Diamond State Port Corp. ,* 990 A.2d 393, 397 (2010); *Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1160 (2010).

Regarding the ICGFFD claim, asserted by Claimants, under Delaware law, the implied covenant is a limited and extraordinary legal remedy.  *Glaxo Grp. Ltd. v. DRIT LP* 248 A.3d 911, 919 (2021).  The implied covenant of good faith and fair dealing is  a remedy that ensures the parties do not act in a way that frustrates the overarching purpose of the contract by taking advantage of their position to implement the agreement's terms.  *Winshall v. Viacom Intern. Inc. ,* 55 A.3d 629, 636 (2011). Importantly, the covenant is invoked to protect the spirit of the agreement and prevent underhanded tactics  that deny the other party the benefits of the bargain.  *Kelly v. McKesson HBOC Inc. ,* 2002 WL 88939 at 10 (Del. Jan, 17, 2002). As was stated by the Delaware Supreme Court: "An implied covenant claim. . . looks to the past. It is not a free-floating duty unattached to the underlying legal

18

documents. It does not ask what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of the contracting.  'Fair dealing' is not akin to the fair process component of entire fairness, i.e. whether the fiduciary acted fairly when engaging in the challenged transaction as measured by duties of loyalty and care whose contours are mapped out by Delaware precedents. It is rather a commitment to deal 'fairly' in the sense of consistency with the terms of the parties' agreement and its purpose.  Likewise, 'good faith' does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract.  Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally.  . ." *Gerber v. Enterprise Products Holdings, LLC* , 67 A.3d 400, 418-419  (2013).

The covenant fills in the gaps of the contract.  As indicated in the above cited cases, the issue of concern is review of the contractual relationship created at the outset by Respondents and their customer, an arbitrage like Heka.  In certain ways, the evaluation of the covenant looks to the conduct of the customer who happens to be a major arbitrageur.  The Arbitrator assesses what are the two parties' contractual expectations and concerns under the MSA and also the incorporated UA and USDC. We need a full hearing on this.

19

The Arbitrator denies both sides Rule 18 motions for summary judgment dealing with the breach of contract and the Claimants' implied covenant of good faith and fair dealing.

**Claimants' Claim for Declaratory Relief.**

Regarding the issue of declaratory relief Claimant seeks, the Arbitrator notes there is no obligation for Respondents to enter into a new contract with Claimants after the MSA has expired. There appears no legal authority obligating them to do so. The MSA at Section 9(a) states "The Term of this Agreement shall commence on the effective Date and, unless earlier terminated in accordance with this Section 9, continue until the end of the Initial Term. . . . The Parties agree that, except as otherwise set forth herein, Circle shall not be obligated to perform any Services after the expiration of the Term of this Agreement." The MSA was agreed upon by the two parties in March 2023. The relationship was suspended by Respondents on December 1, 2023. If the MSA was not renewed, as Respondent had the right to do, the MSA would now be without legal consequence since they would not renew the contract. It would seem the MSA would have no validity if not renewed. The Arbitrator does not perceive another outcome in light of this nonrenewal. The Arbitrator is unable to rewrite a contract in light of hostility by a party. "It is axiomatic that courts cannot rewrite contracts or supply omitted provisions. Do so does not respect the parties' freedom of contract." *Murfey v. WHC Ventures, LLC,* 236 A.3d 337, 350 (2020).

20

The Arbitrator therefore sustains the Respondent's Rule 18 motion dealing with Claimant's assertion of Declaratory Relief.

**Claimants' Cause of Action pursuant to the Deceptive Trade Practices.**

The claim of Claimants for relief under the Delaware Deceptive Trade Practices Act is defective because Claimant is clearly a customer of Respondent in this contract.  Under the contract, as a customer of Respondent, the Claimant lacks standing because the two parties do not enjoy a horizontal relationship here.  They are vertical as parties and standing is lacking under this statutory scheme.  See *Grand Ventures Inc. v. Whaley,* 632 A2d. 63, 70 (Del 1993); *Strong v. Wells Fargo Bank,* 2012 WL 6961995 at 2 (Del. Super .Ct. Nov. 30, 2012).  Also, if Claimants are relying on representations outside the four corners of the MSA, they cannot use these statements to alter a contract provision supporting their horizontal contractual relationship.  *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.,* 2016 WL 5243950 at 9 (Del. Ch. Sept. 22, 2016).

The Arbitrator therefore sustains Respondents Rule 18 motion dealing with Claimant's Delaware Deceptive Trade Practices claim.

<strong>CONCLUSION</strong>

The Arbitrator anticipates the arbitration hearing will involve a proceeding where the witnesses explain their understanding of the key contracts involved in

21

this case.  After all, what remains now is a focus on the written agreements relevant to the dispute.  The context of these contracts will be provided by testimony that is examined and then cross-examined.  We will discuss the process of the arbitration hearing itself during the next conference call later this month.[3]

DATE: April 14, 2025

_Robert L. Dondero_

Hon. Robert L. Dondero (Ret.) Arbitrator

---

[3] Both Claimants and Respondents submitted additional information on their respective positions after the briefing of this case was submitted. The Arbitrator did not consider these materials in this ruling here.  It is up to the attorneys whether to use these documents in their arbitration itself.