# EXHIBIT 2

JAMS ARBITRATION

REFERENCE No. 5400000585

HEKA FUNDS SICAV PLC,

 Claimants,

And

CIRCLE INTERNET FINANCIAL, LLC

 Respondents.

Attorneys for Claimant Heka Funds SICAV PLC.

 McDermott Will & Emery LLP

  Eli Berman

  David Kiefer

  One Vanderbilt Avenue

  New York, New York 10017-3852

  Email: eberman@mwe.com

  Email: dkiefer@mwe.com

Attorneys for Respondents Circle Internet Financial LLC

 Jones Day

  Mark W. Rasmussen

  Yvonne W. Chan

  100 High Street

  Boston, MA 02110-1781

  Email: mrasmussen@jonesday.com

  Email: ychan@jonesday.com

1

## FINAL AWARD

THE UNDERSIGNED ARBITRATOR, having been designated in accordance primarily with Section 17 of the Master Services Agreement (MSA),[1] with Section 26 of the User Agreement dealing with Arbitration, dated on or about January 3, 2022, and having examined the submissions, proof and allegations of the parties, find, conclude and issue this Final Award as follows:

The factual findings that follow are necessary to the Award. They are derived from admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that these findings differ from any party's position, that is the result of determination by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weighing of evidence, both oral and written.

## INTRODUCTION.

This arbitration deals with the right of the Respondent Circle Internet to engage in its business purpose based on a series of contracts agreed upon by Respondent and Claimant Heka Funds at arm's length and with each enjoying a sophisticated status as commercial parties.

## STATEMENT OF FACTS

---

[1] While the MSA is considered by the parties as the controlling document dealing with arbitration of this matter, there is additional reference to arbitration in another contract relevant to this action. That would be the User Agreement signed by the parties prior in time to the MSA. The reference in the User Agreement to arbitration is found in Section 26 of the User Agreement.

**The Business Model Known as Circle Internet.**

The Respondent in this arbitration is Circle Internet Financial LLC.  It is a company that issues USDC, a stablecoin used for payments, trading, and other financial services. Transcript (Tr.) 269:1-21; 270:25-271:23 (Razzaghi).  All USDC in circulation is backed one-for-one by U.S. dollars and other highly liquid assets.  Tr 280:6-12 (Razzaghi). Circle accounts are only available to institutions approved by Circle; these institutions can use their accounts (all made without charge) to convert U.S. dollars into USDC, called minting, with a value of $1 United States dollar) (USD) for 1 USDC. They call also redeem or "burn" USDC with Circle at the same value.  Tr. 273:24-274:3 (Razzaghi). Access  to USDC is not limited to customers approved by Circle; our Claimant Heka Funds had the business option to buy and sell USDC through secondary markets on cryptocurrency exchanges like Binance and Coinbase.  Tr. 271:2-7 (Razzaghi). Heka continued after the events in this arbitration to trade in USDC on the same secondary market.

Since Circle was the issuer of USDC it had a primary duty to ensure the trust in the ecosystem of USDC for all customers who held USDC.  Tr. 272:16-273:3 (Razzaghi).  Razzaghi's understanding of the role of Circle was important due to his position as the Chief Business Officer of Circle.  To him, the USDC "ecosystem" was a critical notion that Respondent sought to positively maintain for the businesses and customers that used the product, USDC, in trading and monetary activity.  Tr 272:2-15 (Razzaghi). The Chief Business Officer and several other witnesses presented by Respondents viewed this USDC ecosystem as a force beyond Circle alone and encompassing USDC as a product where Respondents had a caretaker role to guarantee the integrity of USDC as an asset that could be trusted by its users.  The commercial security of USDC was a critical feature of Circle's global operations along with its status as a trusted product. Tr. 272"12-273:3 (Razzaghi).

3

The integrity of this ecosystem under Razzaghi was central to the business model.  Circle was a "regulatory-first" company.  Tr. 270:15-18; 273:17-274:8 (Razzaghi). Carpenter testified that to Circle, regulatory compliance was intrinsic to everything Respondent did. (Tr. 498:16-22). Norton echoed this business model when he noted Circle was a "very conservative company," that stressed a strict approach to its regulatory requirements.  Tr. 591:1-16.  During the hearing, the witnesses identified several agencies Circle had regulatory obligations with including the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), the New York Department of Financial Services, along with other state money transmitter licensing agencies, the Monetary Authority of Singapore, European Union regulators that supervise the Markets in Crypto-Assets Regulation ("MiCA") and others.  Tr. 339:12-340:8; 342:22-24 (Razzaghi); Ex. 43 at Bates 551 (Section 39).

Anti-money laundering programs and know-your-customer duties were part of the regulatory functioning of the Respondent's ecosystem intending to satisfy its licensing standards. Tr. 276:7-10; 278:9-279:7 (Razzaghi).  To the management of Circle, the regulators imposed important obligations on Respondent to maintain standards that worked to determine whom Circle partnered  with directly.  Tr. 276:7-278:6 (Razzaghi).  The  compliance standards at Circle secured the Respondents' commitment to a proper corporate ecosystem  for users of USDC.

Securing the Circle USDC ecosystem by regulatory compliance with current as well as future customers at Circle was a corporate obligation. Tr. 274:9-275:2; 355:8-10; 442:21-443:6 (Razzaghi).  Regulatory compliance and the resulting integrity it authored to Circle was deemed by Cole Carpenter as a central part of his duties; he had direct customer relationships as he relied on Circle's position as a business model focusing on high standards in the USDC arena.  Tr. 498:2-10.  Included in this highly professional relationship at Circle was the understanding that Circle's

customers also would provide correct information consistent with what Circle expected of its own employees in dealing with their clients.  Tr. 274:12-24; 341:3-342:17 (Razzaghi).  Naturally, these standards fostered by Circle and expected reciprocally from its customers could have negative effect on the advancement of the Circle business model.  Circle's emphasis on  regulatory compliance  could  jeopardize certain business relationships with various traders in the crypto world.  Circle realized its high standards resulted in the consequence that less than 10 percent of commercial account applicants were allowed to realize a Circle USDC account directly with the company.  Tr. 275:11-20; 282:24-283:9 (Razzaghi).  Circle refused to accept or continue to engage with clients who did not pass the compliance requirements or follow the obligations of Respondent's User Agreement.  Tr. 274:12-24; 281:22-282:1; 282:24-283:9 (Razzaghi).

**The Circle Internet User Agreement.**

In order for a client or customer to open an account with Respondent and become directly associated with Circle, the customer had to apply for an account known as a User Agreement, agreeing to the specific terms and conditions in that contract.  Tr. 500:1-7 (Carpenter).  Since Circle is a financial services company, the User Agreement had sections that gave Respondent substantial authority to undertake action Circle considered necessary.  One key provision in the User Agreement, applicable to Claimant as well as any other entity that signed the contract, was Section 15.  This provision gave Respondent the right to place minting and redeeming limits on any Circle account unilaterally. Section 15 of the User Agreement stated: "Circle reserves the right to change the deposit, withdrawal, storage, transfer, and velocity limits on your Circle Account as we deem necessary .  We may establish individual or aggregate transaction limits on the size or number of deposits, withdrawals, transfers or other transactions that you initiate using your Circle Account during any specified time period."  Ex. 43 at CIRCLE Bates 545 (Sec.15); Tr. 284:2-

5

285:9 (Razzaghi).  The purpose of Section 15 was to recognize the right of Circle to limit redeeming and minting financial activity by its customers so that Respondent would satisfy its regulatory obligations and also have sufficient liquidity to process financial transactions with Circle's banking partners.  Tr. 285:10-25 (Razzaghi); 504: 15-505:1 (Carpenter.).

Minting and redeeming limitations were reflected in all customer accounts at Respondent.  During the course of the relationship under the User Agreement, Circle could reduce those limits.  Tr 284:2-4; 339:4-7; 348:9-25 (Razzaghi); 503:24-504:1, 505:19-508:2 (Carpenter); 593:22-24, 594:18-595:10 (Norton).  This authority was not really challenged during the arbitration.  Respondent had this authority and could exercise it for a variety of business reasons such as suspected improper activity or  concerns the customer's business activity was not compatible with the business practices the customer represented to Respondent.  Tr 503:24-504:14, 505:19-506:6 (Carpenter); 594:18-595:10 (Norton).  Norton considered such restrictions to be an appropriate and contractual right at Circle.  This transparency of the account status was visible to all customers---they simply had to log into their business account to review the status.  Tr. 505:13-18 (Carpenter), 207:17-19 (Frontini).

This User Agreement had other provisions agreed to by each party, including Claimant, which were necessary for Respondent to conduct its business and satisfy perceived regulatory obligations. Tr. 295:2-22 (Razzaghi).  In Section 16 of the User Agreement, Respondent had the authority to change or discontinue services without giving notice to the client.  Section 16 stated: "Subject to Section 17 of the USDC Terms, Section 16 of the Bridged USDC Terms, and Section 17 of the Euro Coin Terms. . . we reserve the right to change, suspend, or discontinue any aspect of the Services or the Platform at any time, including hours of operation or availability of any feature, without notice and without liability.  We may, in our sole discretion, delay any transaction

6

if we believe that such transaction is suspicious, may involve fraud or misconduct, violate applicable laws or payment network or ACH rules, or violate any term of this Agreement." Ex 43 at CIRCLE Bates 545. Section 20 of the User Agreement barred a variety of conduct, including "market manipulation or other forms of market-based fraud or deceit," and places customers on notice that Circle monitors for this behavior, as Respondent's regulators want this activity prohibited on the Circle platform." Tr. 288:12-289:20 (Razzaghi); Ex. 43 at CIRCLE Bates 545-46.

The User Agreement also contained provisions to guarantee customers provide complete and accurate information due to Circle's reliance on the information provided by its customers to satisfy the compliance obligations dealing with laundering and "know-your customer" obligations. Tr. 341:3-342:21 (Razzaghi). Customers agreed under the terms of the User Agreement to provide additional information Respondent asked for to identify money laundering, fraud, and other financial crimes. Ex. 43 at CIRCLE Bates 539 (Section 1). During the onboarding process, Circle asked its customers about the beneficial owners of the company because these owners can be the source of funds that might be used to convert dollars into USDC. Tr. 283:10-284:1 (Razzaghi). Respondents' customers were asked to "warrant that all information provided to Circle in the User Agreement is true and accurate; it does not serve to mislead in *any* respect." (emphasis added). Ex. 43 at CIRCLE Bates 540 (Section 1); Tr 502:5-15 (Carpenter) (need accurate information for regulators and banking partners.).

**The Heka User Agreement Contract with Circle.**

7

Heka agreed to a contract, the User Agreement, with Circle in January 2022.  This was a free Circle account for Claimant to use by its Elysium Global Arbitrage Fund (Elysium).  Tr. 194: 18-195:11 (Frontini); Ex 231 at CIRCLE Bates 3627).  This exhibit identified Elysium under the DBA name of Heka.  As a new account, Claimant engaged in the opening of the contracting process and provided information to Respondent concerning the nature of its business, Claimant's intentions doing business with Circle by opening the account, and information about its ownership.  Ex. 231; Ex 234.

Hindsight indicated that Claimant did not fully disclose important information regarding its business structure.  Claimant disclosed a single *Heka* investor, a person named Simon Grima.  Tr 199:1-200:1 (Frontini); Ex. 231 at CIRCLE Bates 3628.  However, Claimant omitted disclosure of the specific investors in the Elysium sub-fund who were actually providing the needed capital that Claimant would use to mint and also redeem USDC through the particular and relevant account Claimant was opening. Tr. 199:1-200:21 (Frontini).  It is difficult to characterize this disclosure omission as a mere oversight by Claimant since it was using the account for *Elysium's use.*  In fact, *Elysium* was identified as *the*  business name of Heka in any application materials that were submitted during the application process and the initiation of the User Agreement.  Tr. 197: 3-18 (Frontini); Tr. 443:7-19 (Razzaghi); Ex 231 at CIRCLE Bates 3627.  To this Arbitrator, this omission was intended to avoid the disclosure of Tether's role in Elysium.  At the time of signing the User Agreement, Heka knew that Tether, as a key backer of Circle's main competitor---the sponsor of USDT---and primary super investor in Elysium, would trigger bells and whistles of concern to Circle.  Tr. 347:2-8 (Razzaghi); Tr. 200:2-21 (Frontini).  In fact, Razzaghi testified that if Respondent knew of the Elysium-Heka-Tether relationship in January 2022 when the User Agreement was signed, it would *not* have allowed Heka to open an account with Circle.  This

business stance by Circle was based on the Respondents' concern regarding Tether's position in the cryptocurrency industry and the obvious competitive stance Tether posed with Circle.  Tr. 346: 14-348: 8 (Razzaghi).

Importantly for our analysis of the legal issues in this case is the testimony from Claimants' witnesses that the User Agreement was reviewed by its leadership before the contract was signed.  Tr. 201:11-18 (Frontini). Frontini was the founder of Heka, its leader, and he knew that Claimant would be responsible to adhere to the terms of the User Agreement as any Circle customer would be once the pact was signed.  The terms of the Agreement explicitly stated that Circle enjoyed the right to evaluate the activity of the contracting parties for improper conduct, especially behavior dealing with the participation in the Respondents' ecosystem and the vending of USDC.  Tr. 201:15-18, 204: 20-205:20 (Frontini).  Frontini confirmed he understood that Respondent had the right to create limits on any account including Heka's and testified this right of Circle was very common in the industry.  Tr. 206: 11-24; 207: 9-16; 208:3-5; 210: 5-15 (Frontini).  In fact, the record in this arbitration manifested Heka did not complain about having to seek assent from Respondent for any changes in Heka trade limits, a contractual arrangement compatible with usual market practice.  Tr. 209: 13-22; 210: 16-19 (Frontini).  Our record clearly established that at all times Claimant had an account with Circle there were limits on Heka's ability to trade USDC with Respondent, which were stated regularly in the Heka accounts.  Tr 207: 9-19 (Frontini).

**Heka Agrees to the Second Contract with Circle, the Master Services Agreement.**

9

With the record reflecting a substantial business relationship between Heka and Circle through the period of 2022 into 2023 under the established User Agreement, Circle offered Heka the opportunity in March 2023 to establish an improved banking service with Respondent. Heka was offered an opportunity to facilitate its redemption and minting of USDC with Circle. Tr 87:3-88:22 (Frontini). This banking service employed the Customers Bank of Circle through Circle's application programming interface (API). Tr. 214:15-215:25 (Frontini). This API permitted Heka to access its Circle accounts and the Customers Bank without having to log in through the Respondents' website. Tr 215: 6-18; 217: 15-218: 18 (Frontini); Tr. 509:13-510:15 (Carpenter). Importantly, the Master Services Agreement (MSA) did not change the provisions dealing with trade behavior and proprieties of Heka in its direct relationship with Respondent; it did not take away the rights ensured to Circle under the existing User Agreement that became central to this arbitration as the case developed. It was correct that the MSA and use of API  as with other services Respondent provided to Heka were free. According to the testimony of Circle representatives, the MSA was primarily a software license. Tr 299:10-16, (Razzaghi), 546: 14-22 (Carpenter).

Carpenter sent Frontini the necessary documentation for the MSA upon request from Frontini. Tr. 509:1-510:2; 544:16-545:8 (Carpenter); Ex. 17 at HEKA Bates 8400-8401. Once Frontini, the head of Claimant, received the MSA from Carpenter, he signed the document within *two minutes* according to his testimony! Tr. 216:9-217:14 (Frontini) Ex 17 at HEKA Bates 8401. Prior to signing the MSA Frontini affirmed he had no discussion with Circle leadership regarding trade limits to Heka's activity before the MSA was in fact signed by Claimants. This record clearly established that Frontini understood any limitations under the User Agreement imposed on Heka dealing with minting and redemption would still be in place. Tr. 217:15-18; 217: 23-218:18

10

(Frontini). Indeed, this Arbitrator asked Frontini during his testimony whether he understood that the User Agreement would remain in "full force and effect" after he signed the MSA, he confirmed he believed this would remain the case. In fact, he acknowledged he recalled a specific clause in the MSA confirming the continued application of the User Agreement. (Tr. 218:9-18) Frontini.

The record in this arbitration made clear the MSA was not intended to alter Respondents' right to place limits on any trades of Heka's account. Tr 216:25-218:21 (Frontini); 292:21-293:10 (Razzaghi); 510:3-11 (Carpenter). In an email introduced in evidence, Frontini confirmed the MSA specifically allowed Heka to only mint or redeem USDC consistent with the terms of Respondents' *User Agreement.* "Customer may purchase any Circle Coin pursuant to the *terms of the Circle User Agreement and* deposit such Circle Coin into its Circle Account. *Customer may also redeem any Circle Coin pursuant to the terms of the Circle User Agreement."* (emphasis added). Ex 75 at CIRCLE Bates 1811 (Section 3(a)(i). Razzaghi confirmed Circle would *not* have signed the MSA if this contract precluded Circle from its right to maintain limits on the Heka account. Tr. 292:21-293:10 (Razzaghi).

With the signing of the MSA, Circle enjoyed the continued validity of the User Agreement *expressly confirmed* within the language of the MSA, as indicated above. The MSA also allowed Circle to terminate or suspend its professional services to the customer. Section 2(d)(i) of the MSA gave Circle the right to "refuse, limit, condition, or suspend any Transactions or portion of the Services that Circle believes (a) may violate this Agreement, any Legal Requirement, or other agreements Customer may have with Circle [such as the User Agreement], or (b) expose Customer, Circle or others to risks *unacceptable* to Circle." (emphasis added). Ex. 75 at CIRCLE Bates 1811. Under Section 9(c) of the MSA Circle was also allowed to suspend services under the

11

MSA for various reasons.  Such suspensions would be without prejudice to any other rights or remedies. This exercise could be taken *if Circle* "determines in its sole discretion that a customer is engaged in an activity that causes a significant risk of reputational harm to Circle" or if Circle "reasonably believes that a Transaction, this Agreement or the performance of it, or Customer's activities may be contrary to the Legal Requirements or Sanctions."  Ex 75 at CIRCLE Bates 1814-1815. Circle enjoyed this termination right if "Circle determines, *in its sole discretion,* that the customer is engaged in an activity that causes a significant risk of reputational harm to Circle. .." (emphasis added).  These were rights reserved by Circle under the MSA; with the understanding they were unilateral as presented in both the User agreement and MSA agreement. At no time during the critical period of the case did Claimants challenge these unilateral and express rights of Respondent. To Circle, it was  important to the Chief Business Officer Razzaghi that Circle enjoyed such authority to permit it to act against any customer whose business behavior did not correspond to the customer's representations to Respondents or that may be upsetting the USDC ecosystem.  Tr. 298:14-299:9 (Razzaghi).

It is also true that the MSA set limitations on damages.  The MSA barred punitive and special damages including lost profits generally. Ex 75 at CIRCLE Bates 1819.  See also Section 15(f) of the MSA capping damages.  These limits according to Razzaghi made sense since Respondent was allowing Heka access to Circle's services for free.  At no time did Heka pay Circle anything for the opening of any account, the minting or redeeming of USDC, or to enjoy access to the API features of Circle.  Tr. 279:22-2805; 299: 10-20 (Razzaghi).

**Heka Trading Behavior during 2023 with USDC and Circle**

12

In 2023, soon after Heka signed off on the MSA, a financial crisis did take place in and around March of that year. Tr. 305:20-22 (Razzaghi). One of the banks Circle had placed its reserves for USDC transactions, Silicon Valley Bank, was placed into receivership. This caused the price of USDC to drop, a feature known as "de-pegging" USDC. Tr. 306:1-20 (Razzaghi); 510:19-511:10 (Carpenter). In this context, de-pegging presented an attractive arbitrage situation against the interests of USDC for arbitrage traders like Claimant who were able to buy USDC on the secondary marketplace for less than a dollar and then redeem it at Circle for a dollar. Tr. 511:20-512:1 (Carpenter).

Circle saw this March event as something traders would attempt to capitalize on, adverse to the interests of Circle. Tr. 600:17-25 (Norton). The level of redemptions that did occur generally were seen as indicators that Respondent had the partners in place to facilitate the redemption expected generally of its USDC obligations. This reality was good for market confidence. Tr. 512:16-513:13 (Carpenter). Trade activity did increase the price of USDC on secondary markets and the spread became narrow. Tr. 512:2-6 (Carpenter). Eventually, the spread became sufficiently narrow so that the attraction of USDC to exchange became no longer the concern it had been and traders halted their redemption behavior. Tr. 513:17-514:12 (Carpenter); 601:18-602:6 (Norton).

Of course, during this same period, Heka continued to engage in arbitrage, redeeming substantial volumes of USDC with Circle. Tr. 514: 3-516:3 (Carpenter). To the leadership of Respondents, the Heka trades presented an anomaly since it was not compatible with the market behavior of other traders. Tr 307:24-308:4, 381:5-7 (Razzaghi), Tr 514:7-21 (Carpenter), 602: 7-24 (Norton). The witnesses for Circle at the hearing expressed concern that Heka was engaging in behavior other players saw little value in profiting from, and these other traders confirmed this

13

suspicion.  Tr. 515:16-516:3 (Carpenter); Tr. 602:17-22 (Norton).  Market players pondered what the economic basis for the Heka trades of USDC was since Claimant was tying up large amounts of capital for a trade that generated little profit.  Tr. 605:3-606:19 (Norton); Ex 83 at CIRCLE Bates 2756; Ex 81 at CIRCLE Bates 2740; Ex 82 at CIRCLE Bates 2751.

Acting to reconcile this issue with its contractual partner, Circle engaged in numerous emails with Heka dealing with their trade philosophy reflected in the behavior.  Tr. 514:22-516:3 (Carpenter).  As Carpenter testified, it is not uncommon for Circle to reach out to its contract partners for an understanding of particular trades.  Tr. 529:10-530:1(Carpenter).  Carpenter was told that Heka saw a favorable arbitrage situation present with USDC continuing to trade on market exchanges for less than $1.  Tr. 516:7-9 (Carpenter).  However, Respondent did not see this approach with other traders. In fact, the consensus Circle learned from other traders was that the risk and expense of trading on such a small volume was not attractive.  Tr. 605:3-19 (Norton).  Norton wondered whether Heka had a secret approach other traders did not know about.  Tr. 603:8-14 (Norton).

**Circle's Investigation Into the Trading Stance of Heka.**

After considering the trade activity of Claimant compared to other trading entities in the cryptocurrency market, Respondents determined Heka had a relationship with Tether, Circle's key competitor in cryptocurrency that was apparently unique.  Tether waived the fees it charged for minting USDT when Heka was involved.  Tr. 308: 5-24 (Razzaghi), 523: 23-254:24 (Carpenter); 613: 15-614:10 (Norton).  Circle further learned that other traders or Circle customers were not obtaining from Tether the same concessions Heka was receiving from Tether, even though Heka argued others were treated likewise.  Tr. 524: 3-10, 525:15-19 (Carpenter), Tr. 617:16-618:9 (Norton), Ex 91 at CIRCLE Bates 5032; Ex 94 at CIRCLE Bates 5033.  The professionals at

Circle felt this Tether fee waiver was allowing Heka to enjoy an "unnatural" arbitrage status alone in this marketplace.  Tr. 314:3-22; 319:17-320:8 (Razzaghi), 524:11-525:4, 530:2-25 (Carpenter), Ex 90 at CIRCLE Bates 2792 (this was a manufactured arb and not a market triggered one); Ex 104 at CIRCLE Bates 2863.  Norton called this situation a "red flag." Tr. 614:2-615:16.  Indeed, the inquiry disclosed that Heka started to enjoy the fee-waiver relationship with Tether waiving mint fees in March 2023 as an aftermath of the discussed banking crisis. Again, this was at a time when USDT was in demand and there was no need for any incentives provided to mint USDT.  Tr. 221:19-23 (Frontini); Tr. 637:1-638: 22 (Norton.).

The level of investment Tether provided with the market trade activity of Heka that was not disclosed to Circle was substantial.  The Tether investment in Elysium Global Fund as of April 28, 2023, was a cumulative balance of shares equaling $500,198,907.52 and the number on May 31, 2023, was $504,634,203.28.  Ex. 227; Tr 186:6-9 (Frontini); Tr. 347:2-5 (Razzaghi); 537:25-538:7 (Carpenter).  Beyond this substantial involvement in Heka by Circle's key competitor was Circle learning Tether had provided Heka interest free loans.  Tr 638:9-22 (Norton).  This information was not provided to Circle. It became the belief of Respondent witnesses that all this information would have been critical for Circle to understand fully the conduct of Heka and whether Circle should continue its ongoing relationship as it currently was engaging.  Tr. 347: 9-13 (Razzaghi) Tr. 538:3-539:2 (Carpenter); Tr 638:23-639:7 (Norton).  Critical to the issue of disclosure was the fact that the degree of Heka's relationship and financial reliance on Tether was only discovered during the discovery phase of this arbitration, frankly years after the severing of the contractual relationship between Claimants and Respondents.

The record in this case indicated that Circle candidly tried to understand the trading behavior of Heka to allow for a favorable relationship. The hostilities only arose later after full

15

understanding in the latter part of 2023.  Circle tried to understand but continued the trading relationship.  Tr 349:1-18 (Razzaghi).  Carpenter was especially interested in not severing the contractual relationship during this period, giving Heka the benefit of fairness and goodwill commercially.  He aimed at focusing on the nature of the partnership and tried to understand their business model as much as possible.  Tr. 529: 3-5 (Carpenter).  The testifying witnesses at Circle did not impose restrictions on Heka in spite of the suspicious behavior the Respondents saw; they discussed business practices with and about Heka with the Claimants themselves and also other customers. The new European based Heka was seen as a company that was engaging in trading and market development that intrigued Circle, at least at the outset during this period.  Tr. 514:22-516:20; 525:5-19; 528:20-529:9 (Carpenter); 617:16-618:9 (Norton.)

This record contains numerous emails between the Circle employees who were most involved in this conundrum during the year 2023. Arbitration exhibits primarily in the form of text messages produced in discovery showed Circle fully assessed the Heka thesis that the arbitrage involving USDC would widen if Heka ceased trading USDC. Tr. 624:3-14 (Norton), Tr. 536:17-537:4 (Carpenter).  They believed the cryptocurrency exchange market was simply behaving the way Heka stated it would.  Tr. 514:16-516:2 (Carpenter); 648:1-24 (Norton); Tr 349: 1-18 (Razzaghi).  The Circle witnesses actually thought Claimant was engaging in fair and unmanipulated market behavior, and that Heka's trading would close the spread in the arbitrage. Tr. 618: 15-25; 620:3-7 (Norton); Ex 102 at CIRCLE Bates 5038.

**Circle Assesses the Relationship with Heka.**

16

As Circle continued to review the trades of Heka and its impact on the working relationship with Respondents, Circle saw a problem.  While Respondents first accepted the explanation provided by Heka on the market trade situation, Circle made a reversal over time.  Tr. 317:10-12 (Razzaghi) 514:16-515:2 (Carpenter).  In April 2023, Frontini told Razzaghi that Circle will not see increased redeeming from Claimant. Ex. 79 at HEKA Bates 8415; Ex 81 at CIRCLE Bates 2741.  In fact, the burning of USDC continued in large volume.  Ex 229.  Carpenter still opined that he would allow the burning to allow for the possible verification of the Frontini thesis that Heka's trading would close the spread even if it was necessary to permit very large redemptions.  Ex. 100 at CIRCLE Bates 2853.  In fact, during a two-week period Circle allowed Heka to redeem more than $587 million in USDC. Ex. 229.  But the spread Carpenter hoped would narrow did not happen.  At least, this pattern demonstrated that the Heka thesis was not credible and suggested to Circle that the market was being manipulated; it was not acting as reasonable and experienced traders had believed it would.  Tr. 527:6-8 (Carpenter); Tr. 317: 25-319:6 (Razzaghi); 628:24-629:23 (Norton).

Because Claimants were concerned about the questions Circle leadership had regarding the narrowing of the spread and the viability of the USDC ecosystem, Frontini offered to stop trading so that Circle could assess the impact on the spread---whether it would narrow or widen. Ex. 87 at CIRCLE Bates 2765 (where Frontini offered to refrain from USDC arbitrage for several days yet warned if that took place the gap would widen considerably); Tr. 525:20-526:16 (Carpenter). Eventually, in May 2023, Circle concluded it would test this Frontini thesis.  Tr. 623:8-15 (Norton); Ex 112 at CIRCLE Bates 2885; Ex 113 at CIRCLE Bates 2887; Ex. 110 at CIRCLE 2874.  Some  Circle witnesses believed that if Heka ceased trading the spread would widen as represented by Heka.  Tr. 536:17-537:2 (Carpenter); 619: 5-620: 7 (Norton).

17

On May 11, 2023, Norton told Heka to pause trading with USDC so that Respondents could evaluate the spread.  He told Claimants that Circle wanted to assess the possible effect of the Tether fee waiver Heka had and whether this favoritism affected the arbitrage which no one else enjoyed.  Ex 79 at HEKA Bates 8434; Tr. 229:9-18 (Frontini).  While Frontini agreed to the pause, he continued to represent that the spread would widen once Claimant ceased redeeming USDC.  Tr. 229:9-230:12 (Frontini); Ex 79 at HEKA Bates 8435.  Of course, Circle could independently exercise the right to reduce Claimant's redemption limits to 0.  Tr. 320: 9-11 (Razzaghi).

The pause in trading by Heka did not result in a widening of the arbitrage spread as Frontini predicted.  He acknowledged this fact.  Tr. 231:8-11 (Frontini); 320:12-24 (Razzaghi); 533:18-534:2 (Carpenter); Ex 79 at HEKA Bates 2997.  In fact, the spread tightened. Ex. 122 at CIRCLE Bates 2997; Tr. 320:12-21 (Razzaghi); 533: 18-534:2 (Carpenter).  To Norton, the closing of the spread was "a pretty material data point" to demonstrate there was something irregular about the Heka trading policy.  Tr. 632: 12-633:6 (Norton).

During his examination at the arbitration hearing, Norton confirmed he had previously believed that the two entities, Heka and Circle, were working in a universe where the markets were fair and efficient and there was no manipulation of the markets.  Tr. 619:5-620:7; 633: 1-4 (Norton).  However, when the spread did not close, Norton's view changed.  Tr. 738:6-12.  Norton and other members of his team now felt that Heka was possibly "manipulating" the market against Circle.  Tr. 633: 18-22 (Norton); Tr. 534:12-535:1 (Carpenter).  This leadership group at Circle now believed that Heka should be restrained in its redemption of USDC with Respondent due to Heka's alleged arbitrage "conduct".  Tr 633:7-634:4 (Norton); Ex 126 at CIRCLE Bates 2978.  Circle now concluded the fee waiver provided by competitor Tether to Heka was having a consequence on the USDC market of Circle,  and that Respondent was now experiencing a

18

*manufactured* arbitrage situation favoring only Heka.  Tr. 321:6-10 (Razzaghi); Tr 534: 22-535:1 (Carpenter); 634: 5-15 (Norton).  These concerns regarding Heka at Circle were now red flags alerting Circle.  These factors included the fee waiver Heka enjoyed with Tether, the fact that other traders were not taking advantage of the arbitrage, and the disproving of Heka's contention that Claimant's burning conduct would close the spread that was financially hurting Circle.  Tr. 634:8-15 (Norton).

Heka then asked Circle if Claimant could redeem $12 million in a new trade.  Ex. 79 at HEKA Bates 8438; Ex 135 at CIRCLE Bates 3062.  During this request in June 2023, Heka enjoyed a weekly redemption limit of $15 million.  Tr. 321:11-21 (Razzaghi); 534:22-535:1 (Carpenter).  Between June 2023 and November of that year, Heka had not asked for an increase in its redemption limitation and had not registered any complaint about redemption limits.  Tr 322:3-14 (Razzaghi).  Frontini had said these 2023 limits did not raise an issue.  Ex 171 at CIRCLE Bates 027; Tr. 235:7-24 (Frontini).  The evidence showed that it was at this time when the redemption limits were only $15 million that Tether began reducing its investment in Elysium, a fact only learned during the discovery phase of this arbitration.  Tr. 187:18-188:23 (Frontini); Ex. 227.

### The Continued Unease Circle Realizes with Heka in 2023.

In 2023, Circle learned from Coinbase, another cryptocurrency exchange, that Coinbase believed that Heka was engaging in potential manipulative conduct with USDC. Tr. 634:21-635:24 (Norton).  Coinbase told Circle it felt uncomfortable dealing with Heka due to its very close association with Tether and their unique fee structure. Coinbase provided Circle with relevant data that proved consistent to the findings Circle was realizing in the behavior of Heka which Circle suspected was related to the Tether association of Claimant.  Tr 634:21-635:24 (Norton); Ex. 155.

19

In fact, Coinbase chose to place restrictions on their Heka account.  Tr. 232:20-24 (Frontini).  All these factors described above caused Circle to reexamine its contractual relationship with Heka. Respondent now decided to place restrictions on the Heka account under the User Agreement and the MSA.  It placed limits on the minting and redemption options Heka enjoyed; the limits were reduced for each act to 0.  Tr. 330: 10-331: 9 (Razzaghi) Ex. 161.  The Chief Business Officer knew his company had authority under the contracts with Heka to reduce these trade limits to 0. Tr. 332:19-23 (Razzaghi).  It should be understood that the Heka accounts were not suspended formally at this time; Claimant still had access to its Circle account and could engage in limited access with USDC.  Tr. 330:2-331:9 (Razzaghi); 636:13-19 (Norton).

With the trade limits in place, Heka sent a letter  to Circle threatening legal action against Respondent if the limits were not cancelled. Frontini also advised that Claimant would initiate a regulatory complaint against Circle.  Tr. 333:9-25 (Razzaghi); Ex. 171 at CIRCLE Bates 25-26.  In light of this recent history covered above and the Frontini letter threatening legal action, Circle decided to implement its contractual authority and suspend Heka's account with Circle.  Tr. 338:6-339:7; 419:7-10; 421:13-18 (Razzaghi).  With the approval of legal counsel, Circle advised Heka that their account was formally suspended on December 1, 2023, and the letter advised the suspension was based on Section 9(c) of the MSA, referenced previously. This notice was based upon Circle's regulatory obligations.  Tr. 337:14-338:5(Razzaghi); Ex. 177.Razzaghi believed the conduct of Heka was harming its product world-wide and damaging USDC; with the company believing it was obligated to act per the User Agreement and the MSA.  Razzaghi believed Circle had this right under the contracts to engage in commercial activity with partners it chose to deal with.  Tr. 446:25-447:11 (Razzaghi).

**CIRCLE EXERCISES ITS RIGHT TO NOT RENEW THE MSA.**

20

Heka petitioned to make a $100 million redemption demand with Circle involving USDC during the month of February 2024. This ask happened during the period when the redemption limits of Heka were still set by Circle at 0. The request by Heka was denied. Tr. 328:15-329:1; 431:14-20 (Razzaghi); Ex. 191 at CIRCLE Bates 5007. The denial of Heka's request was evaluated by the Circle Compliance team who were the group denying the application. Tr. 431:14-20; 441:8-11 (Razzaghi). It was also during this period that the renewal of the one-year MSA agreement was approaching. The "Initial Term" was for one year from the date of signing. MSA, Section 1 (ff). If not renewed by both parties, the MSA would expire. It had been previously signed, the Initial Term, on March 23, 2023. Tr 344:20-25 (Razzaghi); Ex 75 at CIRCLE Bates 1807. Since Circle believed their business relationship with Heka was essentially over, the company decided it would not renew the MSA. Tr. 345: 4-346:11 (Razzaghi). Curiously, during the same month, Tether did invest another $500 million into Elysium. Tr. 189: 2-190:19 (Frontini). Approximately one month later, Heka filed an Arbitration Demand under the Agreements . At the present time, Tether invested $800 million in Elysium which is approximately 75% of Elysium's total assets. Tr. 191:2-14 (Frontini).

**HEKA'S SURPRISE ATTEMPT TO CREATE A NEW CIRCLE ACCOUNT.**

Two months before the start of this very arbitration hearing Heka tried to develop contractual access to the Circle platform by creating a new account with a Circle subsidiary, Circle France. Ex. 220. The Demand had already been filed but Frontini contacted Circle sources in France without alerting the parent in the US or the  retained counsel of Circle engaged in the arbitration process in Boston. The new application contained no reference to the pending arbitration. Ex. 217, Ex 219; Tr. 166:9-21, 249:9-20 (Frontin). Candidly, Frontini admitted he used the Circle France operation because he believed he would be unsuccessful opening an

account in the US.  Tr. 250:5-21 (Frontini).  In fact, Heka misrepresented it had a present relationship with Circle in a board resolution needed to obtain authority to open this account submitted to Circle France.  Ex. 221; Tr. 251:10-253:11 (Frontini).  Naturally, to the suspicious Respondent this was a further deterioration in the perception of Heka as a proper business partner for Respondent.

## LEGAL DISCUSSION

This arbitration, after pre-arbitration motions and the presentation of evidence during the hearing, now consists of only two separate claims, each one the Claimant must establish by a preponderance of the evidence.  They are a breach of contract against Respondent and the violation of the covenant of good faith and fair dealing.  Each one was reviewed by this Arbitrator under the law of Delaware as provided by the User Agreement and the MSA.  In the end the assessment here was dependent on the four corners of the contract and what it permits the individual parties to do.

**Delaware is a Contractarian State.**

The Claimants have presented a substantial and competent discussion that it has not engaged in any market manipulation in this arbitration.  However, the fact remains that, on hindsight, this case is one in which the two parties entered into not one but two contracts which clearly allow Respondents to first limit and then rescind the minting and redeeming rights of Heka under the circumstances of these facts.  These were, objectively speaking, reasonable calls by Respondent and support the decision here that there was no breach of contract by Respondents in their decisions.  Also, it is clear and already adjudicated in the Rule 18 decision of this Arbitrator the MSA relied upon by Claimants was going to terminate in March 2024 as was expressly stated

22

in the MSA.  Circle had the proper right to rely on closing this one-year agreement at its expiration date without further renewal.

The law of Delaware is strongly in favor of reading the four corners of a contract, and, if there is no ambiguity, adopting the contracts as controlling.  Very recent decisions by the Supreme Court of that state can only lead to this conclusion.  In *Cantor Fitzgerald L.P. v. Ainslie,* 312 A.3d 674 (2024) (*Cantor Fitzgerald)* the court at the very start of the opinion stated: "The courts of this State hold freedom of contract in high---some might say, reverential---regard.  Only a 'strong showing that dishonoring a contract is required to vindicate a public policy interest even stronger than freedom of contract' will induce our courts to ignore unambiguous contractual undertakings." *Id.* at 676-677.  In *Cantor Fitzgerald,* plaintiffs challenged a contract provision that the lower courts concluded was contrary to public policy because the provision precluded limited partners from recovery of partnership earnings after violating the anti-competitive contractual principles in the agreement.  The lower courts found the contract contrary to public policy.  The Supreme Court held it was a valid provision  the parties previously agreed to and therefore was enforceable. Importantly, the Court noted that the scales were partially tipped in favor of contract terms precluding earnings because both sides in the contract were sophisticated parties and entered into the agreement as such.  *Id.*at 677.  Sophisticated parties were expected to know what they agreed to.

In *Thompson Street Capital Partners IV  L.P. v. Sonova United,*  340 A.3d 1151 (2025), (*Thompson)* the Supreme Court recently held that "Delaware is a contractarian state that holds parties' freedom of contract in high regard. 'When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language. Clear and unambiguous language is 'reasonably  susceptible to *only one* interpretation.' Language

from a contract need not be perfectly clear for an interpretation of it to be deemed as the only

reasonable one. . . When no ambiguity exists, the contract will be interpreted according to the

'ordinary and usual meaning' of its terms.  The parties' steadfast disagreement over interpretation

will not, alone, render the contract ambiguous." *Id.*at 1165-1166. *Thompson* is  important because

it is a most recent ruling confirming the contractarian jurisprudence of Delaware law.  The case

also was important due to an issue regarding the interpretation of two contracts in the dispute

where the decision found evidence of integrated contracts which must be read in a *unitary*

*contractual scheme*. *Id.* at 1166-1167.  "The parties agree that the Merger and the Escrow

Agreements form an integrated agreement. . . the merger agreement integrated the escrow

agreement by referencing 'ancillary agreements'. . . Accordingly the Merger Agreement and the

Escrow Agreement are integrated and we read them as a unitary contractual scheme."  In our case,

the User Agreement preceded the MSA in time.  However, the MSA expressly stated the User

Agreement was part of the contractual relationship along with the MSA also making a unitary

contractual scheme controlling in the relationship between Heka and Circle.

Finally, for this discussion, another decision of the Supreme Court is noted.  In *Texas*

*Pacific Land Corporation v. Horizon Kinetics LLC,* 306 A.3d 530 (2023) (*Texas Pacific)* the court

noted: "When determining the scope of a contractual obligation, the role of the court is to

effectuate the parties' intent.  The 'parties' intent' is a term of art.  Rather than referring to what the

parties subjectively believed, it refers to the parties shared interest as "would be understood by an

objective, reasonable third party.'  If the contractual language is clear, the court 'will give priority

to the parties' intentions as reflected in the *four corners of the agreement,* construing the

agreement as a whole and giving effect to all its provisions.  The meaning which arises from a

particular portion of an agreement cannot control the meaning of the entire agreement where such

24

inference runs counter to the agreement's overall scheme or plan. . .a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings. . . A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Nor is a contract unambiguous simply because both sides content its meaning is plain." *Id.* at 548.

Cantor Fitzgerald, Thompson Street, and Texas Pacific are but three recent decisions of the Supreme Court that underscore the contractarian nature of legal scrutiny regarding contract agreements in this relevant state.  The Respondents in our case relied on the legal principles of the User Agreement and the MSA that cannot be considered ambiguous and therefore provided the core basis for not finding the initial limit in trading imposed by Circle and the eventual termination of Circle's relationship with Heka improper. The actions by Circle were a valid exercise of their rights under the contracts.  While the Arbitrator does appreciate the vigor of Claimant's stance here, the fact remains the contracts say what they say and are therefore binding on this decision.  Frontini did confirm these agreements were in place in his testimony.  He was obligated to abide by their terms.  Certainly, the leadership at Circle understood the User Agreement was controlling and testified they would not have entered into any relationship with Heka if they were not able to rely on the stated contract rights enjoyed under the User Agreement. Additionally, the review of Claimants' pleadings provided no reason to conclude the User Agreement was otherwise lacking enforcement even after the MSA was signed.  We must understand the MSA was an agreement to facilitate access to information sources of Circle; by its explicit terms, the MSA affirmed the continuing vitality and applicability of the User Agreement in the financial relationship between Heka and Circle.

25

**Claimant Failed to Establish that Circle Breached the Terms of the Relevant Contracts.**

At the time that Circle decided to reduce the redemption limits enjoyed by Heka, the relationship between the two parties was expressly controlled by both the User Agreement and the MSA. Under the express language of these agreements, Circle had contractual authority to reduce the redemption limits of Heka. Indeed, in May 2023, Heka agreed to allow Circle to reduce Claimant's limits to assess the effect of pausing Heka's arbitrage on the spread in exchange of USDC. Tr. 527:23-528:15 (Carpenter); Ex 88 at CIRCLE Bates 2768 (Frontini affirms Heka was agreeable to stop trading in USDC for a few days to assess the spread consequences); Ex. 90 at CIRCLE Bates 2793. The Heka limits in trading went to 0 without complaint by Complainant on May 11, 2023. Tr. 229:9-230:2 (Frontini); Tr. 485: 12-486:10 (Zaffaroni).

After this assessment, Heka was permitted to resume its redemption of USDC, but Claimant did not ask to return to its $7 billion redemption limit but only be reinstated for a lone redemption of $12 million. Interestingly, this ask by Heka reflects the apparent understanding the Claimant knew it could only redeem USDC with the approval of Respondent. Ex. 79 at HEKA Bates 8438 (June 1, 2023). Respondent granted the request and established a weekly redemption limit for Heka at $15 million. *Id.*; Ex. 134 at CIRCLE Bates 3060. To Claimant, this was acceptable; in fact, Frontini later acknowledged the $15 million limit created no issue. Ex. 171 at CIRCLE Bates 0027; Tr. 235:19-24 (Frontini). Importantly, these limits were imposed June 2023 on the arbitrageur by Circle. Only months after the fact did Claimants complain about the limitations in trading and use the then consented-to limitations as a basis for their Demand in the arbitration.

In reality, we have a record here where Claimant assented to the May-June limitations Circle placed on the Heka account due to Respondents' conclusions regarding the suspect trade behavior of Claimant, reflected in the facts of the case. More importantly to this Arbitrator, as one assesses the allegation of breach by Respondents is the fact trade limits were explicitly permitted under the contracts here. Frontini affirmed that trade limits were "very common" in cryptocurrency contracts, and he knew his operation would need approval from Circle if Heka wanted to change limits. He did not complain until the ultimate end of the relationship about this condition. Tr. 206:22-24; 209:13-22 (Frontini). To Circle and its Chief Business Officer Razzaghi, the contractual right of Respondent to impose redemption and minting limitations was a fundamental feature of the company's regulatory obligations and maintenance of a proper crypto ecosystem. Tr. 287:16-21 (Razzaghi). He would not have assented to any contract including the MSA if Razzaghi understood such would cancel Circle's right to impose limits on minting and redemption. Tr. 285:21-23; 292:21-293:10 (Razzaghi); 510:3-11 (Carpenter). Under Section 3(a)(i) of the MSA Heka has the authority to mint and redeem USDC only "pursuant to the terms of the Circle User Agreement." Ex 75 at CIRCLE Bates 1811. This is confirmed in the Heka Demand at ¶ 41. During the hearing itself, while testifying, Frontini confirmed that he understood after signing the MSA, the User Agreement was still in full force and effect. He acknowledged the MSA contained a provision deeming the User Agreement to be in full force and effect under the MSA in spite of the understanding the MSA was signed later. Tr. 217:23-218:18 (Frontini); Ex. 75 (MSA) at CIRCLE Bates 1811 (Section 3(a)(i)). By this concession, reliance on the MSA as the exclusive legal contract in the case was nullified. The MSA did not supplant the User Agreement, the two contracts had ongoing vitality effective upon signing.

27

The MSA provided improved software access to Heka; it did not essentially alter or even modify the contractual relationship between these two parties.  Reducing the Heka redemption limits was not a breach of contract when Circle had the right to limit redemption per the contracts in this case.  Further, Circle's denial of Claimants' application to enjoy $100 million redemption rights in February 2024 after Circle had decided the redemption rights of Heka would be set at 0 was simply an expression of what Circle had authority to do under the contract. Circle was under no contractual obligation to adjust redemption limits when a party made a unilateral demand for this to happen.  The User Agreement specifically stated Circle could change limits "as [it] deem[ed] necessary" and "to change, suspend, or discontinue any aspect of the Services or the Platform at any time. . . *without notice and without liability."*  Ex 47 at CIRCLE Bates 0545 (Sections 15 and 16 of User Agreement) (emphasis added); Tr 284:13-285:9; 294:11-295:22 (Razzaghi).  It was a feature of the Circle-Heka relationship as well as the status of many Circle customers that any party in contract with Circle could observe their limits set by Circle.  Frontini conceded this arrangement.  Tr. 207:17-19 (Frontini); 286:25-287:15 (Razzaghi), 595; 11-17 (Norton.).

The events in May 2023 were not properly characterized as a mere suspension; Circle did what it was allowed to do under the contracts in this case.  Respondent told Claimant to stop redeeming USDC, explaining Circle's desire to assess the effect of halting Claimant's redemption on the nature of the spread.  This restriction  did not halt the ability of Heka to deal with Respondent's product in other ways or to mint USDC.  Tr. 229:8-230:2 (Frontini); Tr. 700: 5-8 (Norton); Ex. 111 at CIRCLE Bates 2880.  In November 2023, when Circle in fact reduced the minting and redeeming limits, the Claimant could continue to log in to its account and engage in other business activities beyond those acts suspended.  Tr 330:2-9 (Razzaghi); Tr. 293:20-294:4;

28

442:8-12 (Razzaghi); 636: 13-19 (Norton); Ex 156 at CIRCLE Bates 3311 (Circle did not revoke API access and suspend Heka's account in November). Of course, as indicated previously, Heka could always trade in USDC on the secondary markets.    Later in 2023, Circle decided to suspend the Heka services as contracted when Claimant threatened Circle with legal action.

One of the contentions presented by Heka during the case was that the MSA was essentially the new and controlling agreement in the relationship between the two parties.  This position is factually contrary to the concession by Frontini that the User Agreement always remained in full force and effect along with the signed MSA.  Tr. 217:15-218:18 (Frontini). Additionally, the MSA expressly affirms the important minting and redeeming services Circle provided remain controlled by the User Agreement as the parties had voluntarily contracted.  Ex 75 at CIRCLE Bates 1811 (Section 3(a)(i).

**Under the Contracts, Circle had the Authority to Suspend Services with Heka.**

The view of the witnesses presented by Circle during the arbitration provided evidence that the company believed Heka's behavior was inconsistent with the legal requirements Circle operated in the crypto world and in fact justified Respondent's belief that it would provide reputational injury to Circle.  Respondent presented credible testimony from their key witnesses that Circle reasonably believed Heka was practicing manufactured and possible manipulative trading during the relevant period and this was harming the USDC ecosystem.  (See above discussion).  Under Section 9(c)(v) of the MSA, conduct by a partner like Heka which Circle believed would create a significant risk of reputational harm to Respondent and which *"may"* be contrary to the legal norms was subject to proper preclusion by Circle.  Ex. 75 at CIRCLE Bates 1815 (Section 9(c)(v)).

29

The User Agreement advised Circle's contracting parties that Respondent barred a range of market behavior including "wash trading, front-running, insider trading, market manipulation, or other forms of market-based fraud or deceit." Ex. 43 at CIRCLE Bates 0545-0546 (Section 20 of User Agreement); Tr. 204:20-205:20 (Frontini). As testified by Razzaghi "[I]t is part of our own regulatory obligations, when we work with the regulators; that this kind of activity is prohibited on our platform. [I]f we find out it is happening; we will put an end to it. Because this kind of activity can actually damage the USDC ecosystem. It can damage holders of USDC." Tr. 289:10-23 (Razzaghi); Tr. 531:1-12 (Carpenter) ("if you have a situation where the market is being manipulated by a single actor, that leads to massive distrust in the system"). By its written terms, Section 9(c)(v) does not require Respondent to prove Heka violated *any particular law or regulation* as a predicate for suspending a customer like Heka. Instead, the section requires a determination, but at the "sole discretion" of Circle, the conduct of the customer "may" be contrary to a legal requirement.[2] Ex 75 at CIRCLE Bates 1815. Furthermore, Section 9(c)(v)(b) of the MSA requires only a determination by Respondent at its "sole discretion" that the activity caused a "significant risk of reputation harm." This particular section does not obligate Respondent to establish *any* legal, regulatory, or policy violation with elemental proof obligations.

The Arbitrator concluded that Circle's conclusion that a party was engaging in prohibited activity was a determination made by Respondent based on the evidence discussed above and that this conclusion was found before they acted. Circle was not obligated to wait for further evidence under the User Agreement or the MSA. This suspicion was sufficient proof for Circle to act as it

---

[2] Under the contracts relevant here, "Legal Requirements" are defined in the MSA to include laws and regulations and also "all applicable orders, judgments, decisions, rules, policies, attorney general opinions, or guidelines passed or issued by any Regulatory Authority or any competent court, including the Circle Acceptable Use Policy." Ex 75 at CIRCLE Bates 1807 (Section 1(kk).)

did.  Tr. 295:2-25, 339:12-340:18 (Razzaghi) Tr. 507:16-21 (Carpenter). A reading of the

agreements relevant here permitted the Respondent to have broad flexibility here due to its

regulatory obligations. Circle has to rely on its instincts, experience in the field, and information

provided by market traders.  Tr. 519:10-23; 532:22-533:2 (Carpenter); Tr 615:1-5 (Norton).  We

must realize that Heka always did and still does have the option of trading in secondary markets

that may not apply the ecosystem concerning Circle practices in its direct dealings with customers

like Heka.  Tr. 272:16-273:3; 274:12-275:2; 276:5-10 (Razzaghi); 58:5-11 (Frontini).

The Arbitrator has placed considerable reliance on the rights Circle enjoyed under these

contracts in its monitoring of Heka's market behavior.  The Statement of Facts detailed above

verify the level of caution Circle practiced as it assessed the market behavior of Heka and the

slack it provided Claimants during the period of 2023.  The conclusions reached by Razzaghi, but

especially by Carpenter and Norton as these two men came around to in fact suspect Heka after

forthright evaluation of the red flags, were critical to the Arbitrator's evaluation of the evidence

but also the corporate motivation of Respondents.  Respondents came to conclude the assertion by

Heka that the spread would widen if Circle restricted trades of Heka was eventually rejected by

Respondent; something it had the right to do. Add to this eventual determination Circle's

realization that Heka had operational incentives that were unlike those of other traders and the

calls by Circle became appropriate in the latter part of 2023.  All this is detailed in the Statement

of Facts.

Once Claimant halted its redeeming of USDC, the spread did narrow, a fact that was

inconsistent with the contentions of Heka that would take place.  This suggested to Respondents

that Heka may be manipulating the spread to the disadvantage of Circle.  Tr. 534:3-535:1

(Carpenter); Tr. 320:12-24, 321:7-10 (Razzaghi). Even Frontini observed the spread did close at

this time with Heka trading halted. Tr. 231:2-11 (Frontini). However, efforts by Circle to lower

the trade limits of Heka resulted in Heka generating a formal complaint to Respondents. Circle

interpreted this hostile position of Heka unfavorably and decided to suspend services to Claimants.

Tr. 338:6-16 (Razzaghi). This was because Respondent perceived the market behavior of Heka as

manipulative against Circle's best interests, damaging the product. Section 9 (c)(v) allowed Circle

to suspend Heka's participation, a step undertaken by Respondent during this period.

The evidence presented during the arbitration supported the conclusion Circle believed the

Claimants were engaging in a practice that deflated the value of USDC, Circle's product, in an

artificial manner posturing a false demand that was not true. Respondents reached this conclusion

after substantial consideration of the market factors discussed earlier in this Award. It was a

conclusion not trivial in nature and supported by case authority.[3] To Respondents, Heka was

purposefully keeping the spread open by suppressing the price of USDC on the secondary market

and suggesting a false impression of redemption volatility. This was happening even though

Heka's trade volume under normal market conditions, likely should have increased the price and

closed the spread which would have cancelled any redemption demand of USDC. To Circle's in-

house team, this was primarily due to the unique association and financial backing Heka enjoyed

with the main competitor of Circle, Tether. Tr. 540:13-23 (Carpenter). To Circle, the conclusion

---

[3] See *Commodity Futures Trading Comm'n v. Parnon Energy Inc.,* 875 F.Supp 2d 233, 246 (SDNY 2012) (market manipulation can involve false stimulus to market pricing that improperly characterizes the true price and precludes a fair determination of the market price under a free competition environment.); *Commodity Futures Trading Comm'n v. Gorman,* 587 F.Supp 3d. 24, 41 (SDNY 2022). The "manipulative act 'refers generally to practices. . . are intended to mislead investors by artificially affecting market activity. . . [In market manipulation review] courts ask 'whether the transaction or series of transactions sends a false pricing signal to the market or otherwise distorts estimates of the underlying economic value of the securities traded." *Securities and Exchange Commission v Hwang,* 692 F.Supp 3d 362, 383. Here, Circle perceived at the end of their trade review of Heka's behavior as evidence of "false pricing" as Claimant engaged in the arbitrage of USDC with Circle and USD and like liquid currency. Of course, Respondent did not have to *prove* this behavior, they had to have reasonable suspicion it was happening, which the record reflects positively here.

and bottom line was that the trading by Heka was not natural; it was manufactured. Tr. 312:5-17

(Razzaghi), 528: 6-10, 530:18-22 (Carpenter); Ex. 90 at CIRCLE Bates 2792; Ex. 104 at CIRCLE

Bates 2863.

This conclusion that Heka was engaging in improper behavior was reached by

Respondents after a full evaluation of the facts and issues presented.  The evidence in this record

supports the observation this conclusion was not lightly reached and that Circle debated the matter

before first limiting and then termination the minting and redemption opportunities once enjoyed

by Heka.  It must be remembered Circle did not have to prove Heka was engaging in improper

market conduct.  It appears the parties did not include in either the User Agreement or the MSA a

requirement Circle have a particular degree of proof before it could properly react to its perception

of Heka's conduct.  It did have to entertain evidence, reasonable business judgment,  that the

trades by Heka were part of an improper scheme that would injure the Respondent.  Ex. 133 at

CIRCLE Bates 3044; Tr. 319:22-320: 13-21 (Razzaghi).  The observed red flags noted above were

reasonably relied on by Circle for their conclusions; after all, evidence of Heka's "intent" under

any scenario is generally circumstantial at best.  They have been addressed above; repetition is not

necessary here.

The conclusions reached by Circle were objectively reasonable after full consideration of

the entire issue and Heka behavior.  Inconsistent market behavior and trading allow for evidence

of intentional market manipulation.  *S.E.C. v. Masri,* 523 F.Supp. 2d 361, 373 (SDNY 2007);

*Gorman, supra,* 587 F. Supp 3d at 44.[4]

---

[4] It was the theory of Claimants that market manipulation necessarily required more than was shown. Heka cites to cases such as *Sullivan & Long v. Scattered Corp.* 47 F.3d 862 (7th Cir. 1995) and *GFL Advantage Fund LTD v. Colkitt* 272 F.3d 189 (3d. Cir. 2001), among other cases. To this Arbitrator, the issue regarding market manipulation, after consideration of the arguments from each party, is

Furthermore, the evidence demonstrated that Circle's processing of the relationship with Heka during 2023 reflected a lack of honesty by Heka. The wealth of emails provided in discovery shows this. Ex. 104 at CIRCLE Bates 2863 ("Is there more to the story that Fabio isn't telling us"); Tr 318:13-319:6 (Razzaghi); 532:7-16 (Carpenter). While Frontini represented to Circle they should not observe further burning from Heka in April 2023, the fact remained that in May 2023, Claimants were still redeeming volumes when the spread was only three base points. Ex. 79 HEKA Bates at 8415; Ex 81 at CIRCLE Bates 2741. As pointed out in the factual discussion, the promised narrowing of the spread as represented by Heka did not take place.

Add to this background the realization on the part of Circle that Heka was enjoying a strong financial push from Circle's key rival in cryptocurrency, Tether. Of course, much of this was learned during the discovery phase of the arbitration. However, Circle did learn of Tether's interest in fee waivers to Heka from Frontini. Also, it appears the initiation of this fee waiver started when the Respondent was undergoing some financial rearrangement due to the bank crisis in March 2023, and Tether's relationship with USDT became a trade issue. Tr. 638:1-8 (Norton). Furthermore, Frontini carefully presented himself as just another Circle customer, failing to disclose his relationship with the super funder Tether in the overall Elysium umbrella. It must be conceded that if full disclosure of the Heka-Tether relationship during this period had occurred,

---

whether Respondents had a rational basis for perceiving the trading behavior of Claimants supportive of Circle's conclusion that Claimant was acting in a manner which Circle saw as detrimental to their market position and a threat to the ecosystem of USDC and Circle. If this conclusion was reached appropriately under the facts of this record, and was credible, the contracts in this case allowed Respondents to first restrict or limit, and then also rescind the right of Heka under the agreements to mint and/or redeem their trading rights. After all, Respondents did not have to establish proof of market manipulation by a preponderance of the evidence. They had a contractual right to act if they concluded there was a nefarious reason why Heka was behaving in the trade of USDC unlike other entities that ventured in this space. Circle made this conclusion after full consideration of what they saw was taking place and then acted consistent with the User Agreement and MSA in place with Heka.

Circle would have probably reassessed its business position with Heka and the transactions that were taking place. To the Arbitrator, this view was expressed by Carpenter during his testimony when asked about hindsight regarding Heka's trades "So the reasons for doing those trades start to look a lot less about. . . trying to capture some arbitrage opportunity and much more about trying to be a growth engine for Tether as a company." Tr: 538:20-24; Tr 540:7-541:4.  In summary, this factual situation allowed Circle to reasonably conclude, from their self-interest, that Heka was funded by Circle's major opponent to engage in manufactured trades that happened to take US dollars from the important reserves of Circle to Tether.  No reasonable operation like Circle could properly tolerate such a situation without a full and dramatic response, especially with the contractual rights enjoyed by Respondent under the User Agreement and MSA.  Tr. 347:9-348:8 (Razzaghi).

During the arbitration hearing, Heka presented evidence that the witnesses Frontini and Zaffaroni believed they had no duty to advise Circle, its main competitor was financially subsidizing Heka.  Tr. 254: 7-16 (Frontini); 491:3-7 (Zaffaroni).  Of course, Circle did believe it would be important information especially when Respondents were realizing these trading issues with Heka and the unusual nature of their trades marketwise.  The fact Heka's key witnesses at the hearing failed to acknowledge the critical nature of the Heka-Tether relationship in light of the substantial financial support from Circle's primary market competitor in cryptocurrency is notable. The fact that this relationship caused the decisions Circle made towards the end of the relationship is understandable.  And, Circle had the contractual right to both reduce a customer minting and redeeming activity and even terminate such under section 9 of the User Agreement ("We may. . . suspend your Circle Account,. . . or terminate your Circle Account or suspend your use of one or more of the Services in accordance with the terms of this Agreement, as *determined in our sole*

35

*and absolute discretion."*(emphasis added), and Section 9c of the MSA ("Without prejudice to any other rights and remedies available to it under this Agreement, Circle may at any time terminate this Agreement or any Service, or suspend the provision of any Service. . .")

Also, while Heka took the position it had no obligation to disclose the role of Tether in the operation of Elysium in the contracts it signed with Circle in 2022 and 2023, Frontini did acknowledge Elysium was the DBA for Heka and that the disclosures in 2022 did concern disclosure information regarding Elysium as well as Heka, yet he failed to identify investors of Elysium. Tr. 198:3-18 (Frontini); Ex. 231. Further, the pattern of nondisclosure continued into 2024 when Heka asked to redeem 100 million USDC shortly before the arbitration Demand was filed without identifying the Tether/Heka relationship. Ex. 191 at CIRCLE Bates 5009; Ex 194 at CIRCLE Bates 5011.

Heka may continue to stand on its view it had no obligation to disclose the involvement of Tether in Claimant's ongoing marketing activity with Circle. However, it is patently understandable that Circle perceived the substantial risk of the Tether union with Heka and made the determination it was not a reasonable approach; it endangered the position of USDC in the crypto markets and was potentially deleterious to Circle's operations. Circle's response was it would not allow Tether through Heka to deplete the dollars that supported USDC into a competitor who was focused on USDT---the Tether coffers. Objectively speaking this pattern of obfuscation could be viewed akin to market manipulation when the true reasoning for the Heka behavior is understood. At the very least, it was contrary to the ecosystem of Circle and provided a basis for Circle's concern about continuing the contracts Respondent had, especially considering contractual options it enjoyed suspending or limiting Heka's behavior.

Respondent would not have entered any relationship with Heka if they were not able to rely on the contract rights enjoyed under the User Agreement.  Additionally, the review of Claimants' pleadings provides no reason to conclude the User Agreement was otherwise lacking enforceability even with the MSA being signed.  We must understand the MSA was an agreement to facilitate access to the information sources of Circle; by its explicit terms, the MSA affirmed the continuing vitality and applicability of the User Agreement in the financial relationship between Heka and Circle.

The legal focus of Heka has been that the MSA controls and that Claimant did not engage in market manipulation, which Heka argues was the primary reason for the termination.  However, regardless of whether Respondents have established proper proof of market manipulations consistent with particular cases cited by Claimants, the fact is Respondents have demonstrated to this Arbitrator that they did not breach the MSA or the User Agreements when they terminated their relationship with Heka.  Such being the case, there can be no breach of contract supported by a preponderance of the evidence.

**Circle's Conduct Here Did Not Involve Breach of the Implied Covenant of Good Faith and Fair Dealing.**

The implied covenant under Delaware law obligates the parties to act in a manner that is consistent with the contractually agreed purpose of the parties and their justified expectations under the contractual agreements.  In our case, Claimant understood that Circle would be vigilant in assessing the relationship for evidence of prohibited practices as determined by Respondents.  If such misbehavior was uncovered, Circle had the right to limit, suspend, or terminate trading activity by Heka.  These options were explicit.

37

Any implied covenant claim will normally not survive if "the contract addresses the conduct in issue." *Glaxo Grp. Ltd. v. DRIT LP,* 248 A3d. 911, 919-20 (Del. 2021) (the covenant is "subject to the express terms of the agreement" and is applicable "when the gap in [the] agreement leads to controversy." See also *Allen v. El Paso Pipeline GP,* 113 A.3d 167, 183 (Del.Ch. 2014) (the covenant cannot be used to contradict a clear exercise of an express contractual right.). We have spent considerable time pointing out the contracts here allow Circle to restrict the redemptions by Heka; any covenant claim fails because Circle had a right to do just that.

*Glaxo* is a decision of the Supreme Court and is directly on point. In that case, the contract authorized one company (Glaxo) to cease making payments on a patent to another company (Biogen) if Glaxo "disclaimed" the patent. *Id* at 914-15. The successor of Biogen sued Glaxo when Glaxo gave up the patent and stopped paying the royalties. To the claimant, Glaxo had breached the implied covenant by not continuing the "economic basis" of the agreement. This argument was rejected by the Court. Because the contract *expressly* gave an "unrestricted contractual right" to Glaxo to disclaim the patent, the contract provided "no gap" for an implied covenant otherwise to fill the contract terms. *Id.* at 920-921.

Here, Heka is challenging Circle's decision to do exactly what the contract authorized---place restrictions on Heka's trading. Claimant cannot use a legal principle expressly denied it under the contracts in this case. Claimant cannot agree to terms in a written agreement at the outset and then challenge them after the fact under a claim of good faith and fair dealing. See *Dunlap v. State Farm Fire & Cas. Co.*(2005). Tolerating such an approach here would seriously breach the import of contractual freedom Delaware especially protects. *Aspen Advisors LLC v. United Artists Theatre Co.*843 A.2d 697, 707 (Del.Ch. 2004); *Oxbow Carbon & Mins Holdings Inc. v. Crestview-Oxbow Acquisition LLC* 202 A.3d. 482, 508 (2019) (the implied covenant should

not be used as an equitable remedy for rebalancing economic interests of the parties especially where we have sophisticated parties on each side).  The covenant fails under the law of Delaware.

If the implied covenant was applicable here, our facts attest to the good faith conduct of Circle.  Heka alleges Respondent acted improperly when the restricted minting and redeeming rights of Claimant, and when Circle asserted regulatory rights for its limitations.  Interestingly, Circle under these contracts was never obligated to explain its behavior when it terminated or suspended Heka trading.  What conduct Circle undertook was evidence of its good faith. We know that Circle developed suspicions regarding Heka during this period due to Claimant's arbitrage trading.  Heka was redeeming USDC at larger volumes than other market participants, even with the same arbitrage options available to other traders in the market.  The explanations provided by Heka did not appear consistent or credible under the analysis by Circle market people.  At this very time, Circle learned about the favorable status Heka enjoyed with Tether, Circle's competitor. Circle became appropriately concerned that Heka arbitrage was structured  and possibly encouraged by Tether so that US dollars could be moved to Tether from Circle in exchange for USDC.  The arbitrage closed when Heka paused its trading, increasing the suspicion.  Information from Coinbase confirmed the suspicion Circle had regarding manufactured trading by Heka during this time.  In December 2023, Circle suspended Heka's services under the MSA including any access to the API and other services.

During the discovery phase of this case, as stated at the hearing, Circle learned substantially more about the interrelationship between Heka and Tether, confirming these ongoing concerns. The bottom line is the litany of evidence does not suggest Respondent acted improperly. The balance of evidence establishes good faith treatment of Claimant properly ended certainly towards the close of 2023---evidencing proper business judgment.

The decisions made by Circle and justified by the contracts here were not rashly undertaken to the detriment of Heka. This record is ripe with analysis by Circle's witnesses to evaluate what was going on during the relevant period. The effort was manifest in the testimony and exhibits that Respondents were trying to save the relationship; they were just unable in light of objective evidence. One cannot characterize the positions of Carpenter, Norton and even Razzaghi, or the Circle emails and messages in this record, as evidence pointing to bad faith or inappropriate judgment. During this very period, when doubt existed, Circle permitted Heka to redeem more than $2 billion in USDC. Tr. 331:14-22 (Razzaghi); 563: 13-564:7 (Carpenter); Ex. 229. This was evidence of giving Claimant the benefit of the doubt. It was not akin to the concealed and suspect dealing between Claimant and Tether. To the Arbitrator, one partner under the contract was actively trying to view the trading as positive to a contractual relationship. The other seemed focused on perhaps helping Respondent's competitor at the price of Respondent.

Respondent objectively tried to maintain the contracts with Heka during 2023 as the trade situation was undertaking an ongoing assessment. However, in the end, despite Circle's efforts, the Respondent concluded Heka was acting mischievously. There was no violation of any covenant of good faith and fair dealing under the facts.

## CONCLUSION REGARDING MERITS

This arbitration was professionally litigated by each side. However, the bottom line is Claimant cannot overcome rules dealing with breach of contract and implied covenant that are well established under the law of Delaware. To this Arbitrator, the contract rights in place here were the result of consent by each side; each party acknowledged the important terms relied upon

40

by the Arbitrator and agreed they were in place during the relevant period of the suit.  Claimant cannot craft a valid theory which would supplant the viability of the contracts relied upon in this case first by the Respondents but also by this Arbitrator.  Respondent has established its position as to each claim here by more than a preponderance of the evidence.

Since the Respondent has established the merits of its case, there is no need to engage in a damage analysis, a claim each side presented during the arbitration and post-arbitration papers. Circle suffered no damages here.

Under Section 17 of the MSA, which contains the Arbitration section, the contract states that "the arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorized by law."  The Arbitrator understands this provision to provide for the prevailing party in this arbitration, which is the Respondent, the opportunity to seek further recovery in this matter, now that there will be no award of damages based on the Interim Award.

Continuing with the remaining issues in the Final Award, the Arbitrator must address Respondent's claim for attorney's fees because of this arbitration.

## ATTORNEY FEES

Under the User Agreement in this arbitration, there is no provision for the award of attorney fees.  The MSA states that the Arbitrator can award attorney fees when authorized by the

41

legal requirements of the MSA, section 17(c) or authorized by law (User Agreement at section 26). The parties agreed the MSA was the basis for the jurisdiction of the Arbitrator.

Delaware law, which controls the legal issues of this arbitration, follows what is known as the American Rule.  Under that legal principle, each side of the dispute is required to bear its own fees it incurred as a result of the litigation.  *In re Delaware Public Schools Litigation,* 312 A.3d 703, 715 (Del. 2024) (*Public Schools Litigation*). See also *William Penn v. Saliba,* 13 A3d 749, 758. This is the general rule for each party regardless of the outcome of the litigation. *Johnston v. Arbitrium (Cayman Islands) Handels AG,* 720 A.2d 542, 545 (1998). Exceptions to this allocation principle in Delaware are the limited acknowledgment Delaware has specific exceptions to the Rule when fees may be shifted where (1) the recovery of fees is provided for expressly by statute or court rule; (2) there is a contractual provision regarding entitlement to attorney fees; (3) the party acted in bad faith in connection with the litigation process; (4) the party fails to abide by a court order or is held in contempt; or (5) the action results in the creation, protection or distribution of a common fund or confers a corporate benefit. *Public Schools Litigation, supra.*, at 715-16.

Regarding these exceptions, the Arbitrator stated during the hearing on attorney fees on January 14, 2026, that the relevant agreement, the MSA, as well as the User Agreement, do not provide for the award of attorney fees to Respondent.  While parties to a contract may agree to modify the American Rule to obligate the losing party to pay the prevailing party fees, (*ATP Tour, Inc. v. Deutscher Tennis Bund,* 91 A3d, 554, 558 (Del. 2013), no terms in the contracts relevant here provide for this. No further discussion on this prong is needed, therefore.  Additionally, Respondents have not asserted there is any Delaware statute or court rule that can serve as the legal basis for the award of attorney fees in this case.  The exceptions enumerated as exceptions

42

(4) and (5) of *Public School Litigation* are not suggested in this record and therefore do not apply for any consideration in this case about attorney fees.  Therefore, the remaining legal basis that may apply here is exception (3) which is that Claimant acted in bad faith in *connection with the litigation process.* That issue will be discussed under Delaware case law.

The "bad faith exception" is a limited equitable exception to the American Rule.  The courts in Delaware may award attorney fees to a prevailing party "where the losing party has acted in bad faith in opposing the relief being sought in the lawsuit."  *McGowan v. Empress Entertainment Inc,* 791 A.2d 1, 4 (Del. 2000)(*McGowan* ). However, this exception under Delaware law applies "only in extraordinary cases." It is limited to "extraordinary circumstances as a tool to deter abusive litigation and to protect the integrity of the judicial process." *Montgomery Cellular Holding Co, Inc. v. Dobler,* 880 A.2d 206, 227 (Del. 2005). The exception requires the moving party, our Respondent, to present "clear evidence that the party from whom fees are sought. . . acted in subjective bad faith." *Lawson v. State,* 91 A.3d 544, 552 (Del.2014)(finding no abuse of discretion by the trial court in its denial of attorney fees where there was no finding of appellee's bad faith) (*Lawson).*  The Supreme Court in *Lawson* noted a party cannot successfully invoke this exception simply by showing the party's conduct "was objectively unreasonable, thereby resulting in a statutory violation."  *Id* at 553.  The fact that Claimant here has been adjudicated a wrongdoer under the corporate law of Delaware is insufficient to find bad faith. *eBay Domestic Holdings, Inc. v. Newmark,* 16 A.3d 1, 47 (Del. Ch. 2010) (*eBay Domestic Holdings).* Instead, only the most egregious instances of fraud or overreaching "established by a stringent standard of proof, i.e. clear evidence, will justify the application of this *unusual relief." Arbitrium (Cayman Islands) Handels AG v. Johnston,* 705 A.2d 225, 231-32 (Del. Ch. 1997) (emphasis added); *eBay Domestic Holdings, supra,* at 47.

Unsuccessful legal arguments do not provide a basis for bad faith under this standard. *McGowan, supra,* at 4-5.

The bad faith exception is premised on the theory "when a litigant imposes unjustified costs on its adversary by bringing baseless claims or by improperly increasing the costs of litigation through other bad faith conduct, shifting fees helps to deter future misconduct and compensates the victim of that misconduct." *RBC Capital Markets LLC v. Jervis,* (2015) 129 A3d 816, 877 ( Del. 2015) (*RBC Markets).* Since the goal of this exception to the American Rule is to *correct* abusive litigation and thereby avoid harassment and protect the integrity of the litigation process (*Brice v. State Dep't of Correction,* 704 A.2d 1176, 1179 (Del 1998), it follows the award of fees for bad faith conduct "*must derive* from either the commencement of an action in bad faith or bad faith conduct taken during the litigation, and *not* from conduct that gave rise to the underlying cause of action." *RBC Markets, supra,* at 877.  See also *Versata Enterprises Inc. v. Selectica Inc,* 5 A3d 586, 607 (Del.2010).

In *RBC Markets,* the Delaware Supreme Court affirmed the notion that bad faith can only be found by the tribunal in extraordinary cases and the party seeking to invoke the exception must demonstrate by *clear evidence* that the party from whom fees are sought acted in *subjective bad faith. Id.* The panel went on to identify several incidents in the trial where the court *"determined"* the offending party made "intentional and misleading misstatements of fact" during the trial. These matters struck at the "central issue before" the trial court. Yet the Supreme Court noted the trial court did not conclude fee shifting was warranted because the offending party's conduct did not cross the "threshold of 'glaring egregiousness.'" The conduct may have been aggressive and "problematic." However, the trial court denied a finding of bad faith because "the cases speak of bad faith being reserved for rare situations involving cases of 'glaring egregiousness.'" *Id .* at 879.

44

The Supreme Court seemingly adopted the justification for the denial when it quoted the trial court's comments "this standard of conduct [the need for a finding of glaring egregiousness] implies that we're comfortable with relatively considerable egregiousness.  We're just not comfortable with 'glaring egregiousness.'" [5]

In *Versata Enterprises Inc. v. Selectica Inc.,* 5 A3d 586 (2010) the Supreme Court found that Trilogy and Versata, competitors of Selectica with a "contentious history, recognized that harm would befall its rival [Selectica Inc.] if it purchased sufficient shares of Selectica stock, and Trilogy proceeded accordingly. However, even if the Court of Chancery's opinion is construed as finding that Trilogy acted in bad faith, and even if that finding pertained to conduct that occurred during the litigation, the Court of Chancery still had discretion to deny Selectica's attorney's fee request." *Ibid.* at 608.

In cases such as *RBC Markets* and *Selectica,* the Supreme Court has pointed out the difficult burden a party must satisfy in establishing legally sufficient bad faith for an award of attorney fees.  The focus is on the behavior of the offending party during the actual conduct of the litigation.  It cannot be satisfied by the statements detailed in the  Demand or Complaint, no matter how unsuccessful the facts of that pleading may be in the presentation of proof.  A losing case is not one filed in bad faith. "Not every lawsuit which fails as a question of fact constitutes bad faith" because to hold this as the test "would make bad faith the exception that swallows the American Rule." *General Video Corp. v. Kertesz,* 2009 WL 106509 at *1 (Del.Ch. Jan. 13, 2009) The support for a bad faith claim was basically a focus on the conduct of the litigation in this arbitration from the Demand going forward.

---

[5] The Oxford Dictionary defines "glaring" as something that is "painfully obvious" or "conspicuous." Merriam Webster defines "egregious" as "very noticeable."

Here, the record indicates that the Claimant engaged in discovery as did the Respondent. While there were instances when the Arbitrator was asked to resolve discovery challenges, the record reflects that each side had discovery claims approved and/or denied. Indeed, when the Arbitrator ordered discovery requests by Respondents to be satisfied, the record indicates Claimants complied. Furthermore, during the compliance with Respondent's discovery matters, it appears that Claimants incurred some expense due to their obligation to translate numerous emails and messages that were in Italian. The Arbitrator does not recall serious and prolonged challenges to rulings of the Arbitrator by Claimant in discovery.

It is also true regarding the substantive legal issues of breach of contract and the implied covenant alleged in the Demand were fairly contested in Rule 18 motion. As Claimant points out, the Rule 18 motion was like a summary judgment legal challenge. The Claimant's arguments were sufficient to trigger the denial by the Arbitrator of Respondent's position at the Rule 18 hearing. This arbitration went to a factual hearing because the Arbitrator needed to assess witness testimony due to the legal issues presented. A full hearing was needed to determine the evidence each side presented. It is difficult to find bad faith when the procedure to ferret out weak and insufficient cases, a Rule 18 motion, results in a finding the claims tried in the arbitration needed to proceed to a factual and evidentiary hearing. The reluctance of a court to award fees for bad faith after the losing party had presented a proper summary judgment motion was recognized in *Donnelly v. Pro Pharma Group Topco,* 2023 WL 5528613 at *9 (D. Del. August 28, 2023) when the court noted "we must exercise our inherent powers [to award fees for bad faith] with restraint and caution and should be reserved for those cases in which the conduct of a party or attorney is egregious."

46

Having presented the legal analysis pertinent to the bad faith exception in the American Rule regarding attorney fees, the focus must be on the facts arising during the arbitration which Respondents believe justify their request. The number requested by Respondents is staggering. Respondents counsel seeks $4,376,594.25 in Jones Day fees. Their expert fee request is $652,133, and the JAMS Arbitration fees are $125,200. That presents a potential fee award of $5,153,727.

The assessment of bad faith as indicated above must consider the conduct which satisfies the notion of "bad faith" developed in this "exception" to the American Rule followed in Delaware. This is, as has been stated, a *limited exception,* based on *clear evidence* of *subjective bad faith. Auriga Capital Group v. Gatz Properties,* 40 A3d 839, 880 (Del. 2012). As has been noted, it must be evidence of "glaringly egregiousness." Merely filing a lawsuit, making allegations based on information and belief, asserting claims that the Claimant later dismisses after discovery is completed, or even on the eve of the arbitration hearing does not always satisfy this standard. A review of this record indicates there was substantial discovery sought by Claimant, but also by Respondents in the defense of their client. The record reflects that discovery was properly sought so that each side was able to sustain their particular burden of proof or affirmative defense. Any discovery request by Claimant [since the bad faith notion focuses on Heka's conduct] that was litigated and denied by the Arbitrator was not inappropriately challenged by Heka. Nor was a denied motion repeated based on a claim of newly discovered grounds. Claimant did file its Rule 18 motion which was fairly litigated and resulted in the need for a full-fledged evidentiary hearing on the key claims of the Demand.

In other words, the expenses of Respondent in this matter were directed to the defense of a lawsuit filed by Claimant because Heka believed Circle had engaged in the breach of the MSA

47

without merit and had breached the implied covenant of good faith and fair dealing improperly. Claimant was unable to sustain their burden of proof on these grounds. However, the record generally indicates the matter was contested professionally by the parties without improper motive for the suit, factors that are detailed in the Interim Award discussion of the law and facts of the case.

One feature of the case deserving discussion on the fee issue was the evidence dealing with damages. One of the claims in the Demand filed by Claimant was that seeking declaratory relief. The terms of the MSA stated the agreement would end if not renewed in March 2024. Respondent ended the relationship with Claimants by March 23, 2024; The Respondent did not renew the MSA at any time after March 2024, and the relationship ceased at that time. After that, if not before, Circle was under no obligation to maintain a trade relationship with Claimant. In the Rule 18 motion, the Arbitrator denied the claim for declaratory relief because sustaining a ruling granting Claimant declaratory relief would be devoid of legal consequence since the contract was not renewed by Respondents and the Arbitrator was without authority to force an agreement on a party under the terms of the existing MSA.

In its damages claim, Heka sought approximately $75 million. These damages were broken down into three phases. The lost profits of Heka during phase one, May 11, 2023-November 20, 2023, amounted to $5.6 million. The second phase was from November 21, 2023-March 23, 2024, with the lost profits being $20.4 million. During the third phase, the lost profits of Claimant for the period of March 24, 2024, to March 23, 2025, amounted to $49 million according to Claimant's expert Alvarez. This recitation of potential damages which focuses on the third phase deserves critical comment.

48

Before the presentation of the evidence during the hearing, Claimant knew that the Arbitrator had published his decision that the declaratory relief claim was rejected because of the Rule 18 hearing and order. The Arbitrator had determined Respondent was no longer under any legal obligation to continue its contractual relationship with Heka. The contract had expired by March 23, 2024, by its *express* terms. The Arbitrator had made his decision known in his April 14, 2025, ruling. After the April 2025 Rule 18 decision, but before the hearing in this arbitration, counsel for Respondent made particular email inquiries of Claimant as to whether Heka was going to pursue its damage claims of $49 million for lost profits during the third phase of Alvarez's damage assessment. The response from Heka stated they were pursuing the phase three claim of damages in the amount of $49 million. [6]

The issue for this Arbitrator based on the facts discussed above raised the serious question whether this stance amounted to bad faith on the issue of the third phase damage claim.

There are issues to consider in this regard. From the Respondent's perspective, the background of the litigation before the hearing suggested the claim was seriously presented and vigorously asserted during the hearing. Claimant refused email requests before the hearing to rescind the claim. The posture of Claimants in all matters before the actual hearing did not suggest anything other than full forward behavior in its case strategy. Also, the expert for Claimants had included the particular lost profits in the third period in his report. Interestingly, Claimant's expert Alvarez was not told of the Rule 18 decision of the purported third phase of damages until he was cross-examined by Circle counsel.

---

[6] See attachments presented in email dated January 14, 2026, from Respondent counsel Jenna La Pointe listed emails dated April 23, 2025, from Respondent counsel to Yvonne Chan of Jones Day; email dated April 25, 2026 from Yvonne Chan to Respondents. They deal with whether the third period damages claim would go forward considering the Rule 18 decision.

Respondent team was presented with a duty to their client to anticipate the damage analysis presented by Claimants to be forthright and focused. There is nothing in this record to indicate how Claimants would get around the Rule 18 decision; Respondents had to prepare accordingly and consider all options. This was the perspective of the Arbitrator after considering the high level of counsel performance reflected during all the prior issues in the case. Hence, preparation with the Respondent's team of attorneys as well as prepping its expert was needed.

While Claimant argues the Respondent team did not spend much "arbitration hearing" time on the third phase, that fact does not blunt a skilled attorney's view of what preparation is needed to prepare and defend against a $49 million dollar claim for damages. A lawyer must err on the side of caution when dealing with a specific damage claim that is more than 50% of the total claim of Heka. This is especially the case with vigorous prosecution of the case at the time.

The rule of reasonableness is a part of the assessment of appropriate attorney fees in any review of bad faith exceptions to the foundational American Rule. Respondents cite the Delaware Rules of Professional Conduct for guidance here at page 19 of the Fee Application Brief and *Mahani v. Edix Media Group, Inc.,* 935 A.2d 242, 245-46 (Del. 2022). It is suggested by Respondents any factual analyses or consideration of these factors may be brief and a conclusionary statement deemed sufficient in one cited opinion. *Meyers v. Chatham Cave Assoc. of Unit Owners,* 2025 WL 1744378 at *4 (Del.Super. Ct. June 24, 2025). Respondent's citation to *Meyers* is a curious one. First, the case involved the award of attorney fees based on express terms of the contract in issue in that case. *Meyers* did not deal with bad faith exception. However, the trial court expressly stated that the record needed to demonstrate the particular showing regarding

50

the specific factors considered.[7] "The trial court's consideration of the. . . factors may be brief. It may suffice for the court to state in conclusionary fashion that it considered the factors.  The record must, however, contain some showing that the Court considered them. . Thus, this Court must reverse the attorney fee award as well. 'Failure to give adequate consideration to the *Cox [General Motors v. Cox,* 304 A2d 55] factors is an abuse of discretion.'" Under the *Cox* decision, the trial court should state the reasons for its conclusions, since the parties are entitled to reasons for a judicial decision on the issue, which also permits any review of the reasonableness of the arbitrator's discretionary action unless the reasons are provided in the decision reached below. *Cox v. General Motors,* 304 A.2d 55, 57-58.

The Arbitrator has addressed the high standard placed on Respondents for establishing bad faith for its claim of bad faith.  For the most part, the Arbitrator has determined the standard has not been satisfied and the American Rule applies on the issue of fee recovery by Circle.  As noted, the persistence by Heka to claim damages for the period of March 2024-March 2025, and the need professionally for Circle to address this damage claim was a miscalculation on the part of Claimants and to this Arbitrator merited a proper response by Circle.  However, during the argument regarding fees on January 14, 2026,  Claimant pointed out that Delaware case law suggested Circle must demonstrate the specific tie-in between the claimed fees and the bad faith of Heka. Heka referenced *M & G Polymers USA LLC v. Carestream Health Inc.,* 2010 WL 1611042 (Del. Super.Ct April 21, 2010), and *Bay Capital Finance LLC v. Barnes & Noble Education Inc.,* 249 A.3d 800, ¶¶ 1-3 (Del. 2021) for this legal position. In the Supreme Court order in *Bay Capital* the panel specifically reduced the fee award based on specific factors in the case. The

---

[7] The Delaware Rules of Professional Conduct, as identified in Respondents cited brief, consist of seven factors to consider. See Delaware Lawyer's Code of Professional Responsibility, DR 2-106(b).

51

Court pointed to details where the offending party acted improperly meriting bad faith, which demonstrated the trial court's exercise of proper discretion in finding the bad faith exception.  In its ruling, the Court approved some of the attorney fees based on bad faith but did not permit a full recovery.  In *M & G Polymers USA LLC*, the opinion discussed numerous factors that compelled the finding of bad faith that "Respondents' position was so strained and wholly at odds with the operative reality that it fell *outside the bounds of good faith advocacy.* Second, Respondents could not in good faith aver, under oath, directly opposite to those [facts] they averred in related litigation or change their testimony to suit their needs in this litigation. *Respondents' violation of these fundamental tenets rise to the level of **intentional bad faith,** conduct that justifies an award of attorneys' fees under the bad faith exception to the American Rule."*(emphasis added).  The decision proceeded to review the degree of labor opposing counsel was compelled to engage in to rebut the bad faith by Carestream's counsel in the case.  See *M & G Polymers USA* at \*68-76.

Focusing specifically on the damage claim at issue, the Respondents point out Circle incurred $436,940 in expert witness fees from March 19, 2025, to the end of the hearing on June 5, 2025.  Also, Jones Day incurred during the same period attorney fees of $167,611.50 in connection with expert disclosures and prepping for and presenting expert witness testimony at the hearing.  See Supplemental Declaration of Mark Rasmussen, dated January 13, 2026.  In its response to this issue, Claimant points out the apparent *details* in the *articulated* damage review by Vikram Kapoor, Respondent's damage expert, on this relevant  third period of alleged lost profits claimed by Heka was minimal.  It encompasses a paragraph of his report and is succinct in what he his effort consisted of : "As an initial matter, the amounts calculated in the Alvarez Report [Claimant's expert] for the Third Lost Profits  Period are entirely premised on the assumption that the Master Services Agreement would have been in effect during that time, based on Heka's claim

that Circle was obligated to renew the Master Services Agreement with Heka for an additional year after the initial term. . . My understanding is that the Arbitrator rejected that claim in his April 14, 2025, ruling.  In particular, I understand the Arbitrator ruled that Circle was entitled not to renew the MSA at the end of the initial term."

"Accordingly, it is improper to include any damages during the Third Lost Profits Period, as there was no contract in effect at that time. *Therefore, in this report, I consider Mr. Alvarez's asserted lost profits figure to be $26 million, representing the First and Second Lost Profits Period.*" (emphasis added). See page 4-5 of Kapoor Report.

The statement quoted above indicates little was involved in the actual effort by Kapoor regarding the period of alleged damages prohibited by the Rule 18 ruling by this Arbitrator.  While Respondent compensated Kapoor for his professional work, it appears the expert expenses were not germane to the time period unavailable to the case after the denial of the declaratory relief cause of action. Of course, Respondent's counsel was still obligated to prepare Kapoor as a witness, and it was very reasonable to expect Circle's counsel to review in preparation all phases of damages at issue [even if only raised by the Alvarez report] with his expert Kapoor. Therefore, if the decision to go forward on the Third Lost Profit Period was reflective of bad faith, i.e., harassment or improper motive, then Jones Day legal expenses in this particular feature of the overall case, may be recoverable as an exception to the American Rule.

Having fully considered the issue, and aware of the legal standard that Circle must demonstrate by clear evidence, namely, that Heka engaged in subjective bad faith to satisfy Respondent's legal burden, the Arbitrator has determined Respondent was entitled to recover the fees expended in addressing the expert witness preparation from April 1, 2025-June 5, 2025.  That amount is $164,018.25. Any attorney fee before the Rule 18 decision denying the declaratory

relief claim was not in the opinion of the Arbitrator sufficient evidence of bad faith on the part of Heka.

Regarding the expert fees of Kapoor, the only specific document presented by Respondents besides the Supplemental Declaration of Mark Rasmussen discussed above is Exhibit D (EY Expenses) attached to the original Rasmussen Declaration.  It provided no breakdown of 10 EY employees, including Vikram Kapoor.  The Arbitrator has *no idea* who these additional people are or what they did.  Therefore, relying on the principles of reasonable and informative disclosure discussed previously, the Arbitrator will rely solely on the hourly rate of Kapoor which is stated as $875 per hour.  Based on his statements quoted in the report Kapoor spent some, but little, time on the relevant phase at issue.  The Arbitrator will conclude that three hours were dedicated to the review of damages during this improperly considered period. With the hourly rate as indicated, the Arbitrator will include $2,625 in the calculation of fee recovery for Respondents here.

Combining the recoverable attorney fees of $164,018.25 along with the fees of Kapoor of $2,625, the total Attorney fee award and recovery for Respondent based on this Arbitrator's finding of bad faith only as to the claim by Claimant of lost profit damages during the period of March 14, 2024-March 13, 2025, is $166,643.25.

This Award resolves all issues submitted for decision in this proceeding.

DATE: February 13, 2026


*Robert L. Dondero* _____

Hon. Robert L. Dondero (Ret.) Arbitrator